UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARNE M. JENSEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-11353-DJC |
| ) | |
| JULIUS JENSEN, III and ) | |
| BONNIE BROWN, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                                           June 3, 2011

**I.    Introduction**

Plaintiff Arne Jensen ("Arne") brings this action against his brother and sister-in-law, Defendants Julius Jensen, III ("Reb") and Bonnie Brown (collectively, "Defendants") for claims arising out of the Norwood Farm Trust ("the Trust") and the disposition of Trust land including 264 acres of land off of Polpis Road in Nantucket ("Polpis property"). In his complaint, Arne seeks an accounting of the Trust assets (Count I); claims that Reb has violated his fiduciary duty in management of the Trust (Count II); and seeks a declaratory judgment regarding Arne's rights in connection with the Polpis property pursuant to a June 22, 1990 agreement between the parties (Count III). Reb has now moved for partial summary judgment in regard to Count III. For the reasons set forth below, Reb's motion for summary judgment is DENIED.

**II.    Procedural History**

On June 10, 2010, Arne filed the instant complaint in Essex Superior Court against the

Defendants. On August 10, 2010, Reb removed this action to this Court, asserting subject matter jurisdiction under 28 U.S.C. § 1332. In his amended answer to the complaint, Reb asserted a counterclaim seeking declaratory judgment in his favor and compensation as trustee of the Trust. (D. 33). Reb has now moved for partial summary judgment to dismiss Count III of the complaint under Fed. R. Civ. P. 56. Once Arne had filed his opposition to the motion, the Court scheduled a hearing on the motion for August 3, 2011. In a letter to Court, dated April 20, 2011 (D. 35), counsel for the parties jointly requested that the Court reschedule this hearing for the "earliest practicable date." In support of this request, counsel noted that resolution of the summary judgment would likely resolve an impasse that the parties had reached regarding ongoing discovery in the matter. Accordingly, a hearing on the motion was scheduled and held on May 16, 2011.

**III.     Standard of Review and Burden of Proof**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (internal quotations and citations omitted). "A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5. The moving party bears the burden of showing the district court the basis for its motion and whether there exists a lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

**IV.     Factual Background**

Unless otherwise noted, the following facts are undisputed. On December 9, 1971, Dr. Julius

2

Jensen established the Trust with his sons, Arne, Reb and (now deceased) John Jensen as the beneficiaries. (D. 17 [Defendant's Local Rule 56.1 Statement of Undisputed Material Facts], ¶3; Exh. A [Complaint]).[1] The Trust is a nominee trust that "requires the Trustees to hold the principal of the Trust and receive the income therefrom for the benefit of the beneficiaries, and to pay over the principal and income of the Trust pursuant to the direction of the beneficiaries and, without such direction, shall pay the income to the beneficiaries in proportion to their respective interests at least yearly." (D. 17, Exh. A). At the time of the Trust's creation, Dr. Jensen conveyed the Polpis property as well as other land on Nantucket ("the Non-Polpis property") to the Trust. (D. 17, ¶4). On January 11, 1972, Dr. Jensen resigned as sole trustee of the Trust and, along with his wife, appointed his three sons, Arne, Reb and John Jensen as trustees of the Trust. (D. 17, ¶5). On May 1, 1972, the three sons entered into an agreement (that is referred to in the parties' papers as the "Family Agreement" or the "Boys' Agreement") in which they agreed to certain restrictions regarding the subdivision and use of the Polpis property and certain restrictions on the transfer of each of their beneficial interests in the Trust. (D. 17, ¶6). These restrictions expired on January 1, 2010. (D. 17, ¶6). When John Jensen died in 1974, his beneficial interest passed to his wife, Defendant Bonnie Brown. (D. 17, ¶7).

On June 22, 1990, the three beneficiaries of the Trust–Arne, Reb and Bonnie–entered into an Agreement ("June 22, 1990 Agreement"). (D. 17, ¶¶9-12; Exh. A). Under the June 22, 1990 Agreement, the parties agreed that the value of the Polpis property at the time was $3,990,000; that restrictions in the earlier Family Agreement had the effect of reducing the value of the Polpis property; that a house lot would be set off from the Polpis property and sold for Arne's benefit' and

---

[1]The Court's citations to the record refer to the docket entries as "D. __."

that Arne would sell his one-third (1/3) beneficial interest in the Trust to Reb for $325,000 and Arne would resign as trustee of the Trust. (D. 17, ¶¶10-11). Accordingly, as a result of the June 22, 1990 Agreement, Arne resigned as trustee, relinquished any beneficial interest in the Polpis property, but retained a one-third (1/3) beneficial interest in the Non-Polpis property. (D. 17, ¶11). As of June 22, 1990, Reb remained a trustee of the Trust, now held a two-third (2/3) beneficial interest in the Polpis property (Bonnie still retaining the remaining one-third) and retained a one-third (1/3) beneficial interest in the Non-Polpis property. (D. 17, ¶11).

It is undisputed that any remaining claim that Arne may have in regard to the Polpis property is governed by Section 21 of the June 22, 1990 Agreement:

> 21. It is contemplated by the parties that Bonnie and Reb, after creating house lots for themselves within the meaning of the May 1, 1972 Agreement, may agree jointly to sell to a conservation agency or organization the development rights (meaning the rights to create additional residential lots) to the remaining property or may agree to take jointly equivalent steps such as restricting the bulk of Polpis to agricultural uses. It is agreed by the parties that the $1,330,000.00 in value, which each of them might enjoy were Polpis to be divided into three separate unrestricted parcels at this time, would roughly consist of some $600,000.00 as the value of a "house lot" and some $730,000.00 as the value of the remainder. <u>If, as and when Reb and Bonnie should come to sell the rights to all of Polpis except their house lots, Reb recognizes a moral obligation to Arne to compare one half of his share of the sales price with the 1990 imputed present-value basis of $730,000, and to compensate Arne further at that time should that comparison disclose that Reb had obtained a windfall at that time considering intervening inflation, predictable long-term increases in the value of vacation property on Nantucket and the fact that Reb is assuming the entire pecuniary risk as to the future value of Polpis as between himself and Arne.</u> Should Reb be deceased or disabled at that time, his legal representative(s) shall consult with Ansel B. Chaplin, Esq. of Boston in the course of determining whether there is a windfall profit to be shared with Arne. Arne shall not have the right to anticipate or assign in any manner his expectancy under this paragraph, which shall be limited to himself and his heirs.

(D. 17, Exh. A at 37-38, Section 21 (emphasis added)). Although the parties agree that the "rights

4

to all of Polpis except their house lots" have not yet been sold by Reb and Bonnie, Count III of the complaint seeks a declaratory judgment regarding Arne's rights and Reb's obligations under Section 21 of the June 22, 1990 Agreement. Reb has moved to dismiss this count on summary judgment arguing that Section 21 of the June 22, 1990 Agreement does not give rise to an enforceable legal obligation.

## V. Discussion

### A. The Court Has Discretion to Grant Declaratory Judgment

Count III, the count that Reb now moves for summary judgment to dismiss, seeks declaratory judgment interpreting the 1990 agreement. As an initial matter, it is not clear if Arne is seeking declaratory judgment under Mass. G. L. c. 231A, § 1 (providing that a court may make "binding declarations of right, duty, status, and other legal relations . . . either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen and is specifically set forth in the pleadings") or under the federal Declaratory Judgment Act, 28 U.S.C. § 2201 (providing that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought"). Although the standard of review under the state and federal statutes are similar and provide substantial discretion to the court, "[a] declaratory judgment action is procedural only[, and] . . . '[i]t is settled law that, as a procedural remedy, the federal rules respecting declaratory judgment actions, apply in diversity cases.'" Tocci Bldg. Corp. of N.J., Inc. v. Va. Sur. Co., 750 F.Supp.2d 316, 320 n. 2 (D. Mass. 2010) (quoting Fed. Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 252 (3d Cir. 1986)). Accordingly, the court will consider the relief sought under Count III in this diversity action under the Declaratory Judgment Act. Under the provisions of the Act, "federal courts retain substantial

5

discretion in deciding whether to grant declaratory relief." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995); El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992). In the appropriate case, declaratory judgment "enable[s] litigants to clarify legal rights and obligations before acting upon them." Ernst & Young, 45 F.3d at 534; Sprint Spectrum LP v. Town of Easton, 982 F. Supp. 47, 52 (D. Mass. 1997).

Before the Court exercises its discretion under the Act to grant declaratory relief regarding a claim, the claim must be ripe (i.e., fit for review and to prevent hardship) and there must be an actual case or controversy. Ernst & Young, 45 F.3d at 535 (citing Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) and U.S. Const. art. III, § 2). The matter is fit for review as the factual record as to the meaning of the Agreement, executed in 1990, can be developed now. Moreover, given the allegations in Counts I and II of the complaint, any declaratory judgment under Count III of the complaint may very well affect the resolution of whether Arne's claim for an accounting of both the non-Polpis *and* Polpis property (as alleged in Count I of the complaint) and his claim that Reb owes him any fiduciary duty as to the Polpis property (as alleged in the breach of fiduciary claim, Count II, in the complaint). (D. 17, Exh. A, ¶¶ 32-41). Accordingly, Arne and Reb's dispute as to the nature of Reb's obligations to Arne under the 1990 Agreement presents "a 'direct and immediate' dilemma for the parties" sufficient to justify the issuance of declaratory judgment. W.R. Grace Co.-Conn. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992) quoting Abbott Labs., 387 U.S. at 152-53. Moreover, neither party suggests that this matter is not ripe for adjudication and in fact, Reb answered the complaint with a counterclaim against Arne for declaratory judgment in his favor at least as to his obligation to provide an accounting regarding the Polpis property as sought in Count I. (D. 33).

The heart of the dispute between the parties is the interpretation of Section 21 in the June 22, 1990 Agreement: "If, as and when Reb and Bonnie should come to sell the rights to all of Polpis except their house lots, Reb recognizes a moral obligation to Arne to compare one half of his share of the sales price with the 1990 imputed present-value basis of $730,000.00, and to compensate Arne further at that time should that comparison disclose that Reb had obtained a windfall at that time. . . ." (D. 17-1 at 37-38). Reb argues the "moral obligation" provision under paragraph 21 does not rise to the level of an enforceable legal obligation. He further asserts that, even if the "moral obligation" provision is legally enforceable as a general matter, the phrase "if, as and when Reb and Bonnie should come to sell the rights to all of Polpis except their house lots" creates a condition precedent to the "moral obligation" provision, and that the condition is as yet unmet. The Court has discretion to issue a declaratory judgment that will give the parties certainty regarding their obligations and rights regarding the Polpis property and any accounting that may be required regarding same (which is not expressly addressed in Section 21). SR Int'l Bus. Ins. Co., Ltd. v. Allianz Ins. Co., 343 Fed. Appx. 629, 632 (2d Cir. 2009) (ruling that the district court did not abuse its discretion in issuing a declaratory judgment in a case involving "a pure question of contract interpretation" where it concluded that such "action would 'offer relief from uncertainty' and serve a 'useful purpose in clarifying' the rights of the parties to the proceeds of the W[orld] T[rade] C[enter] Tort Litigation, avoiding additional litigation and assisting the parties in formulating settlement positions and developing settlement strategy" (quoting Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005))); see W. Elec. Co. V. Hammond, 135 F.2d 283, 286 (1st Cir. 1943); Warner Ins. Co. v. Comm'r of Ins., 406 Mass. 354, 361(1990); Billings v. Fowler, 361 Mass. 230, 233 (1972). The Court shall exercise its discretion to issue a declaratory

judgment resolving Reb and Arne's disputes over the "moral obligation" provision and whether the existence of a condition precedent attached to that provision. However, as discussed below, neither argument can be resolved at this stage of the litigation.

    **B.**   **The Meaning of Reb's "Moral Obligation" Under the Contract Is Ambiguous**

The first issue is the parties' dispute regarding the meaning of the Reb's "moral obligation to Arne to compare one half of his share of the sales price with the 1990 imputed present-value basis of $730,000, and to compensate Arne further at that time should that comparison disclose that Reb had obtained a windfall at that time. . . ." under the June 22, 1990 Agreement ("moral obligation provision"). Reb's position is that the moral obligation provision is unambiguous and denotes an obligation that is per se unenforceable in court. Arne's position is that the provision is ambiguous, that the Court's interpretation of the phrase requires an examination of extrinsic evidence and that the extrinsic evidence in this case will make clear that Reb intended to be bound by his "moral obligation" and that the obligation is therefore judicially enforceable.

The issue of whether a contract is ambiguous is a question of law for the court. LPP Mortg., Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009). If a contract provision is ambiguous, there may be review of extrinsic evidence to determine the provision's meaning. Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998). A contract is "only ambiguous 'where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" Id. quoting Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995). The latter is true in this case; the moral obligation provision seems capable of multiple meanings (i.e., whether, when Reb and Arne included the phrase "moral obligation" in the Agreement, their intent was to merely express Reb's

8

present intention <u>at that moment</u>, or whether Reb and Arne intended to denote a binding commitment on Reb's part). Accordingly, the Court rejects Reb's position that the "moral obligation" in the June 22, 1990 is unambiguous.

The cases upon which Reb principally relies upon to suggest otherwise are inapposite. <u>Earle v. Coburn</u>, 130 Mass. 596, 598 (1881) did distinguish between "legal duties" and "moral duties," by noting that the latter "are defined and enforced in a different forum," but that case arose in the contest of the common law. In that case, Earle fed and stabled Coburn's horse without Coburn asking him to do so. Earle then insisted to the court that Coburn was morally obligated to repay him. When the Court refused, it relied on a rule that moral obligations are not automatically enshrined in the common law. The instant case, however, deals with contract law, not common law, and turns not on the nature of general moral obligations between persons in a civil society, but on the precise question about what the scope of the moral obligation provision included in a negotiated agreement among the parties.

Although <u>Schwanbeck v. Federal-Mogul Corp.</u>, 412 Mass. 703, 706 (1992), upon which Reb also relies, concerned the interpretation of a putative contract, it is of no greater aid to his argument. <u>Schwanbeck</u> does not, as Reb suggested at motion hearing, answer whether the "moral obligation" articulated in the Agreement is unambiguous and unenforceable. In that case, the issue before the court was whether the parties' assertions in a letter of intent rose to the level of a binding obligation. In that letter of intent, the parties, in relevant part, stated that the letter was "not intended to create, . . .any binding legal obligation," they expressed their "intention" to negotiate in good faith, but explicitly stated that the parties "agreed that we are under no moral or legal obligation to refrain from negotiating the sale of the [division] with others until the definitive agreement has been

9

executed." Id. at 706. The court held, on such a record, that there was no binding obligation on the parties to negotiate in good faith since there was no ambiguity in the parties' letter of intent. Id. at 705 n.2, 706-07. Although Schwanbeck may be instructive to the Court about whether any promises in the June 22, 1990 Agreement give rise to mere expression of present intention or a legally binding promise, it does not answer the question of whether the "moral obligation" phrase, as used in this June 22, 1990 Agreement, is ambiguous.

Having concluded that the "moral obligation" language is ambiguous, the Court may consider extrinsic evidence. Gen. Convention of the New Jerusalem in the U.S., Inc. v. MacKenzie, 449 Mass. 832, 836 (2007); Nat'l. Tax Inst., Inc. v. Topnotch at Stowe Resort and Spa, 388 F.3d 15, 20 (1st Cir. 2004). Such extrinsic evidence "includes proof of negotiations between the parties, their post-contract conduct, and general trade practice." Id.; see, e.g., LPP Mortg., Ltd., 565 F.3d at 30 (noting that the district court conducted a two-day bench trial, "hearing extrinsic evidence of the parties' intent" where the guaranty was ambiguous). Accordingly, as part of his opposition to Reb's motion for summary judgement, Arne filed with the Court extrinsic documentary evidence related to the June 22, 1990 Agreement. These exhibits concern the course of the parties' negotiations regarding the June 22, 1990 Agreement. (D. 24-27) Prior to this Court's May 16, 2011 hearing, Arne asserted that this evidence "compel[s] the conclusion that, at a minimum, [Reb]'s summary judgment motion should be denied." (D. 22 at 1) On May 17, 2011, in a post-hearing letter to the Court (D. 37), Reb took the position that Arne's proffer of extrinsic evidence is sufficient for the Court to reach summary judgment and issue a declaratory judgment, and that the Court should admit no further evidence regarding the "moral obligation" provision. Arne took a contrary position in a May 19, 2011 post-hearing letter to the Court (D. 38), arguing that the Court should not limit the

10

scope of admissible evidence and should not deprive either party of the opportunity to call witnesses who could testify to the parties' intent. The Court is persuaded by Arne's position.

"[I]f the contract's terms are ambiguous, 'contract meaning normally becomes a matter, for the factfinder'. . . , and summary judgment is appropriate only if 'the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary.'" Bank, 145 F.3d at 424 quoting Den Norske Bank AS v. First Nat'l. Bank of Boston, 75 F.3d 49, 53 (1st Cir. 1996). The Court cannot say, based upon the attachments to Arne's opposition to the summary judgment, that the extrinsic evidence is "so one-sided" to warrant judgment as a matter of law on this matter at this time. First, it may very well be that witness testimony, presented to the factfinder, as part of the extrinsic evidence will elucidate the parties' intention regarding Section 21 of the June 22, 1990 Agreement. Second, although the attachments to Arne's opposition purport to address the course of the parties' negotiations leading to the execution of the Agreement, it does not appear that the exhibits address the parties' post-contract conduct, which may be considered as extrinsic evidence of the meaning of the ambiguous provision. Third, and not insignificantly, now that the Court has ruled that extrinsic evidence may be considered to determine the meaning of disputed clause, both parties will have the opportunity to present their evidence to the factfinder and marshal such evidence in support of their respective arguments.

**C.     The June 22, 1990 Agreement May Contain A Condition Precedent**

The second issue of dispute is whether the paragraph 21 includes a condition precedent. "A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract. If the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced." Sands v. Ridefilm Corp., 212 F.3d

657, 661-62 (1st Cir. 2000) quoting <u>Mass. Mun. Wholesale Elec. Co. v. Danvers</u>, 411 Mass. 39, 45 (1991). The full language of the relevant contractual phrase is "[i]f, as and when Reb and Bonnie should come to sell the rights to all of Polpis except their house lots. . . ." There is no dispute that the Defendants have not sold the rights to all of the Polpis property except their house lots. Accordingly, Reb argues that even if his "moral obligation" is legally enforceable as a general matter, the "if, as and when" language creates a condition precedent attached to that obligation, and that until Reb "sell[s] the rights to all of Polpis except [his] house lot," his obligations regarding the windfall are unenforceable. Arne's position is that the "if, as and when" language is ambiguous as to if or when a sale must take place–as a substantive matter, Arne argues that Reb is obligated to sell the Polpis property within a reasonable amount of time–and that ambiguous language cannot create a condition precedent.

The Court acknowledges the strength of Reb's position that the phrase "if, as and when" is unambiguous. Massachusetts courts have reached this conclusion regarding identical "if, as and when" language or similar phrases in other contracts. <u>See, e.g.</u>, <u>Creed v. Apog</u>, 6 Mass. App. Ct. 365, 371-72 (1978), modified in another respect, 377 Mass. 522 (1979); <u>Spritz v. Brockton Savings Bank</u>, 305 Mass. 170, 171 (1940); <u>Canton v. Thomas</u>, 264 Mass. 457, 459 (1928); <u>Goldman v. Eisenberg</u>, 256 Mass. 566, 567 (1926). However, although the meaning of paragraph 21's "if, as or when" language appears at first blush to be plain–i.e., that Reb and Bonnie "may," but are not required, to sell the Polpis property–and Arne may have an uphill battle convincing the Court otherwise, the Court is reluctant to decide this issue now when it is so closely connected to the meaning of the moral obligation provision in the same Section 21 of the June 22, 1990 Agreement for which the Court will resort to extrinsic evidence to resolve. Resolving these matters in

piecemeal fashion seems particularly unwise where Arne also argues that Section 21 gives rise to an implied promise requiring Reb (and Bonnie) to sell the rights to the Polpis property and to do so within a reasonable time. Moreover, "extrinsic evidence can be offered to show that seemingly plain language, in the circumstances, conceals an ambiguity." LLP Mortg., Ltd., 565 F.3d at 31-32. Accordingly, the Court considers it prudent to reserve ruling on this issue .

**VI.   Conclusion**

For the foregoing reasons, partial summary judgment on Count III of the complaint in favor of Reb is DENIED.

**So ordered.**

                                                           /s/ Denise J. Casper
                                                           United States District Judge