## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|                            |     |                                      |
|----------------------------|-----|--------------------------------------|
| **ARNE M. JENSEN,**        | )   |                                      |
|                            | )   |                                      |
| **Plaintiff,**             | )   |                                      |
|                            | )   |                                      |
| **v.**                     | )   | **Civil Action No. 10-11353-DJC**    |
|                            | )   |                                      |
| **JULIUS JENSEN, III,**    | )   |                                      |
|                            | )   |                                      |
| **Defendant.**             | )   |                                      |

_____

### MEMORANDUM OF DECISION

**CASPER, J.**                                                        August 10, 2012

### I.      Introduction

Plaintiff Arne Jensen ("Arne") has brought an action against his brother, Defendant Julius

"Reb" Jensen, III ("Reb") for claims arising out of their respective obligations under an agreement

(the "June 22, 1990 Agreement") regarding the Norwood Farm Trust ("the Trust") – of which Reb

is a beneficiary and sole current trustee and Arne is a beneficiary and former co-trustee – and

regarding property owned by the Trust, including land off of Polpis Road in Nantucket ("Polpis

property" or "Polpis").  In his amended complaint, Arne seeks an accounting of Reb's management

of Trust assets after the execution of the June 22, 1990 Agreement (Count I); claims that Reb

breached his fiduciary duty as the Trust's sole trustee (Count II); seeks a declaratory judgment

regarding Arne's rights in connection with the Polpis property pursuant to the June 22, 1990

Agreement and an order from the Court awarding Arne his share in the proceeds of any sale of

Polpis property (Count III), and claims that Reb breached contractual obligations that Arne asserts

arose under the terms of the Trust (Count IV).  Having held a bench trial as to Count III on

November 7 and 8, 2011 and having received post-trial briefing, the Court now issues its findings

of facts and conclusions of law with regard to the claim under Count III.

## II.     Procedural Background

Arne filed his initial complaint in this matter on June 10, 2010 in Essex Superior Court.  D.

2-1.[1]  The defendants named in the initial complaint were Reb and Bonnie Brown ("Bonnie");

Bonnie is the widow of Reb and Arne's brother John Jensen ("John") and a beneficiary of the Trust.[2]

D. 2-1 at ¶¶ 2-5, 12.  Reb removed the case to this Court on August 10, 2010.  D. 2.

On January 20, 2011, Reb moved for partial summary judgment seeking dismissal of Count

III.  D. 14.  In support of that motion, Reb contended that the June 22, 1990 Agreement stated in

paragraph 21 that Reb had only a "moral obligation" to Arne, which Reb argued was legally

unenforceable, and contended further that even if the obligation was enforceable as a general matter,

paragraph 21's language stated that this obligation would arise only "[i]f, as and when Reb and

Bonnie should come to sell the rights to all of Polpis except their house lots," and that this phrase

constituted a condition precedent that had not yet occurred.  D. 15.  After a hearing, D. entry for

5/16/11, the Court denied Reb's motion.  D. 43.  The Court held that the term "moral obligation"

as used in the June 22, 1990 agreement "seems capable of multiple meanings (i.e., whether, when

Reb and Arne included the phrase 'moral obligation' in the Agreement, their intent was to merely

---

[1] References to docketed material are abbreviated as "D. __."  References to exhibits submitted
at trial are abbreviated as "Ex. __."  The pagination of exhibits is determined by the number of
pages in the exhibit as filed with the Court, rather than by the various types of pagination on the
original documents.  Accordingly, where an exhibit has an unnumbered cover page followed by
enumerated pages that include the page numbers "1," "2," "3" *et seq.*, the cover letter will be
referred to as "Ex. __ at 1" and the subsequent pages will be referred to as "Ex. __ at 2," "Ex. __
at 3," and "Ex. __ at 4."

[2] On February 28, 2011, Arne dismissed his claims against Bonnie.  D. 29.

express Reb's present intention at that moment, or whether Reb and Arne intended to denote a binding commitment on Reb's part)," Jensen v. Jensen, 2011 WL 2174898, at *5 (D. Mass. June 3, 2011) ("Jensen I"), and that extrinsic evidence, including witness testimony, should "be considered to determine the meaning of the disputed clause." Id. at *6. The Court also stated that, "although the meaning of paragraph 21's 'if, as or when' language appears at first blush to be plain—i.e., that Reb and Bonnie 'may,' but are not required, to sell the Polpis property—and Arne may have an uphill battle convincing the Court otherwise, the Court is reluctant to decide this issue now when it is so closely connected to the meaning of the moral obligation provision in the same Section 21 of the June 22, 1990 Agreement for which the Court will resort to extrinsic evidence to resolve," id. at *7, and reserved ruling on the condition precedent issue until such extrinsic evidence, including witness testimony, could be presented. Id.

On March 21, 2011, Reb answered Arne's complaint and filed counterclaims seeking declaratory judgment stating both that Reb had satisfied his obligation to provide information to Arne with respect to Trust distributions between 1990 and 2005 and that Arne had violated the June 22, 1990 Agreement by changing legal counsel in 2009 (First Counterclaim) and seeking compensation for his performance as trustee from 1990 onward (Second Counterclaim). D. 33 at 8-12.

On August 12, 2011, Arne amended his complaint, including a request for a monetary award as part of his declaratory judgment claim in Count III and adding a separate count asserting that the Trust instrument confers contractual obligations on Reb and alleging breach of contract (Count IV). D. 57. In his answer to the amended complaint, Reb asserted counterclaims identical to the counterclaims raised in his answer to Arne's original complaint. D. 60.

On November 7 and 8, 2011, the Court held a two-day bench trial on Count III. D. entries for 11/7/11 and 11/8/11. Arne, Reb, and Ansel Chaplin ("Chaplin"), who served as Reb's legal counsel during the negotiation of the June 22, 1990 Agreement, testified in person, id., and Arne and Reb stipulated as to the testimony of Michael Puzo ("Puzo") and David Morse ("Morse"), who both served as Arne's legal counsel during the formation of the June 22, 1990 Agreement. D. 65. Over the course of the proceeding, 53 exhibits were admitted. Arne and Reb each submitted post-trial briefing. D. 68, 69, 70, 71.

## III. Findings of Fact

In light of the evidence presented to the Court, the Court makes the following findings of fact.

### A. Parties' Conduct Prior to the June 22, 1990 Agreement

#### *Formation of the Trust*

1. In 1964, Reb and Arne's father, Dr. Julius Jensen ("Dr. Jensen"), purchased roughly 265 acres of land near Polpis Road on Nantucket and additional non-Polpis land. Tr. 1:26, 1:144-45.[3]

2. On December 9, 1971, Dr. Jensen formed the Trust as the sole trustee. Ex. 14. Dr. Jensen and his wife were the Trust's initial beneficiaries. Tr. 1:146. He conveyed the Polpis and non-Polpis property to the Trust. Am. Compl., D. 57 ¶ 8; Am. Answer, D. 60 at ¶ 8.

3. On January 11, 1972, Dr. Jensen engaged in a series of transactions related to the Trust. First, Dr. Jensen and his wife, as holders of the Trust's entire beneficial interest and thus empowered under the terms of the Trust to appoint new trustees, appointed all three sons, Reb, Arne and John,

_____

[3] References to the transcript of trial testimony are abbreviated as "Tr. __:__," with the first number representing the day of trial on which the referenced testimony occurred and the second number referencing the specific page (or pages) of the transcript of that day's testimony.

as trustees. Ex. 49. Dr. Jensen then resigned as trustee, leaving the brothers as the sole trustees. Ex. 48. Additionally, Dr. Jensen and his wife sold their beneficial interest in the Trust to Reb, Arne and John, Ex. 50, in exchange for $200,000 in promissory notes from Reb, Arne and John, Ex. 47, and secured by a mortgage on the Trust's Polpis property executed by the three brothers in their role as trustees. Ex. 46.

*The Brothers' Agreement*

4. On May 1, 1972, Reb, Arne and John, acting in both their individual capacities and in their capacities as trustees, entered into a contractual agreement (the "Brothers' Agreement") that "limit[ed] the right of each Brother to sell or dispose of his interest in the land without first offering the same to the other Brothers." Ex. 16 at 1. The limitations in the Brother's Agreement were set to expire on January 1, 2010. Id. at 2. One limitation set forth in the Brother's Agreement stated that:

> No subdivision of [Polpis] shall be made, (other than into such separate parcels as the Brothers may hereinafter jointly determine so as to permit them and their families to hold portions of the land in severalty) and no buildings shall be erected, placed or allowed to stand thereon other than single family dwelling houses together with customary outbuildings and other accessory facilities, including a private garage for not more than three automobiles, a guest house, tennis court and boat house appurtenant to each such dwelling. No dwelling shall be used for any purpose other than for the owner thereof's personal purposes, except that the owner may lease the property for a term not exceeding six (6) months between May 1 and October 31 in any year. The foregoing, however, shall not be deemed to prohibit the use of the premises for agricultural purposes including animal husbandry, cranberry culture and the like, and the owner shall have the right to construct and use such barns, shelters and facilities as are normally accessory to such uses.

Id.

5. In 1974, John died and his beneficial interest in the Trust became the property of his widow Bonnie. Am. Compl., D. 57 at ¶ 11; Am. Answer, D. 60 at ¶ 11.

5

6. In 1982, Dr. Jensen died. Am. Compl., D. 57 at ¶ 12; Am. Answer, D. 60 at ¶ 12.

*Arne's Interest in Selling the Polpis Property*

7. In 1988, Arne got married. Tr. 1:186. However, by the autumn of 1988 Arne's wife had instituted divorce proceedings against Arne. Tr. 1:33.

8. By the autumn of 1988, Arne needed money due to his marital situation and his business dealings involving a business venture in Atlanta. Tr. 1:33-34, 1:189-91.

9. On November 10, 1988, Reb received an offer to buy Polpis for $4 million and develop the property into an 18-hole golf course and a minimum of 30 residential parcels plus more parcels if the presence of wetlands on Polpis permitted. Ex. 24 at 4. Reb recalled that he and Arne disagreed about whether such a sale was deterred by the Brothers' Agreement. Tr. 1:32. Arne recalled that he wanted to explore the offer, but Reb thought the offer was not in keeping with Dr. Jensen's wishes not to have the land developed. Tr. 1:190.

10. On November 22, 1988, Reb forwarded the November 10, 1988 offer letter to Arne with a cover letter in which Reb stated: "I expect you would prefer to pursue this offer. However, Dad sold this land to us in 1972 only because we agreed it would be used by our family and not developed by others. . . . The reality is that the Polpis property was never intended to be a freely available bequest from Dad which could be turned into cash as desired." Ex. 24 at 1. In the cover letter, Reb further stated that "I am willing to help you work out of your present financial problems. . . . I have confidence that our respective counsel can make a major contribution in achieving this goal." Id. at 1-2. Reb also enclosed a draft response to the offer letter; the draft response stated that "[t]he property is tied up for the foreseeable future by a restriction against any subdivision other than for family lots. In my judgment it would be a waste of time and effort for [the potential buyer] to

pursue any further its interest in this property." Id. at 3. Reb did ultimately reject the offer. Tr. 1:190.

11. From that point forward, Reb and Arne communicated only through lawyers. Tr. 1:34.

*Arne and Reb's Extended Negotiations to Sell Arne's Interest in the Polpis Property*

12. Later in 1988, Arne approached the Nantucket Land Bank ("Land Bank") and asked if they were interested in buying his interest in Polpis for $2 million. Tr. 1:191. Both Arne and Reb recall that Reb was opposed to that idea. Tr. 1:34, 1:191.

13. On February 1, 1989, Attorneys Chaplin (on Reb's behalf) and Puzo (on Arne's behalf) discussed, among other issues, the possible sale of Arne's interest in Polpis to the Land Bank. Ex. 1 at 1; Ex. 25.

14. On February 9, 1989, Chaplin (on Reb's behalf) sent a letter to Puzo (on Arne's behalf). Ex. 1. The letter included six key points. Id. First, it stated that it was Chaplin's understanding that Arne wanted Reb (and Bonnie) to either agree to allow Arne to sell his interest in Polpis to the Land Bank for $2 million or for Reb to buy Arne out for $2 million. Ex. 1 at 1. Second, it stated that Chaplin believed that if Arne sold his interest in an undivided Polpis to a conservation organization, the value of Reb and Bonnie's interests would be impaired and it would therefore be unfair to expect Reb and Bonnie to waive the Brother's Agreement since "[w]hile Arne might be able to realize some of the development value of his interest, Reb and Bonnie almost certainly would not be able to obtain any comparable value for themselves in some future sale." Id. Third, the letter stated that a further difficulty was presented by the fact that determining the present value (in 1989, when the letter was written) of Arne's undivided one-third interest in Polpis when it became unencumbered by the Brothers' Agreement in 2010 would be a highly speculative enterprise and, therefore, the

credibility of any appraisal would be suspect. Id. at 1-2. Fourth, it stated that "[l]ife would be easy if Reb and Bonnie also wanted to sell now," but that "Reb's present thinking is that the development value of Polpis will have greater value a few years from now by which time the Land Bank is likely to have greater financial capability," and that "[t]herefore, we are probably talking about a matter of timing, not whether there should be a sale . . . at some point prior to 2010." Id. at 2. Fifth, it stated that if Arne (unlike Reb) preferred not to wait a few years for the best price for Polpis, then Reb would be willing to negotiate a buyout of Arne's development rights. Id. Sixth, it stated that Reb did not believe that Arne's proposed $2 million buyout price was fair, but that "to protect Arne's upside potential in the lower figure which Reb believes fair,[4] given Arne's desire for funds from Polpis now, Reb would be willing to couple such a buyout with a provision that if the development rights to all of Polpis were ultimately sold for a figure (net of all expenses), one-third of which exceeded Arne's buyout plus Reb's borrowing costs, then Arne would receive the difference." Ex. 1 at 2. Chaplin's letter concluded by stating that "[i]n short, Reb is trying to work with Arne to enable him to achieve all the cash which can be generated on a practical, fair and uncontested basis out of Arne's Nantucket holdings at this time . . . . and he is willing to protect Arne if the future value of Polpis proves to be higher than he thinks it will be," and that "[w]hile the expression of these thoughts is my sole responsibility, their substance has been approved by Reb." Ex. 1 at 3. Other than the content of this letter, Reb has no memory of what he intended with respect to Arne and Polpis as of February 1989. Tr. 1:40.

---

[4] Despite this reference to a "lower figure which Reb believes fair," the February 9, 1989 letter does not specify any such figure. See generally Ex. 1.

15.  On February 16, 1989, Chaplin and Puzo had a further conversation about the possibility of Reb purchasing Arne's development rights in Polpis.  Ex. 2 at 1.

16.  On March 3, 1989, Puzo sent a letter to Chaplin in response to both the February 16, 1989 conversation and to Chaplin's February 9, 1989 letter.  Ex. 2.  The letter stated Puzo's understanding that Reb was proposing to buy Arne's development rights in Polpis for $500,000, minus $100,000 that Arne owed Reb, minus a further $150,000 that Reb felt he had earned by virtue of his previous management of non-Polpis land sales, plus "Reb's assurance that if, as and when the development rights for all of Polpis are sold to a third party, there would be protection on the upside for Arne."  Ex. 2 at 1-2.  Arne testified that he relied upon this notion of upside protection, and would not have transferred his interest in Polpis merely for his house lots and $250,000.  Tr. 1:197-98.  This letter contains the first appearance of the term "if, as and when" in the record before the Court.  Reb testified that he cannot say how the term got into the negotiations, or what the parties intended to accomplish by inserting the phrase "all of Polpis" into the negotiations, but he did not understand that those terms would obligate him to sell Polpis.  Tr. 1:94-95, 1:173.  He further testified that if any proposed agreement had obligated him to sell Polpis he would have rejected the proposal.  Tr. 1:173.  Arne testified that he would not have signed any proposed agreement if he thought the proposal would make it possible for Reb to not sell Polpis and avoid his obligation to Arne.  Tr. 1:198.  The March 3, 1989 letter also stated that Arne would not accept Reb's proposal because Arne believed that it undervalued Arne's interest in Polpis, Ex. 2 at 2, and that Arne and Puzo had spoken with the director of the Land Bank, and she said that the Land Bank would be interested in Arne's rights to Polpis if an agreeable price could be achieved.  Id.  The letter then proposed that a sum of money be set aside to engage in a valuation and land planning study of Polpis

and proposed retaining Jim Czupryna ("Czupryna") as an appraiser who could both appraise Polpis as a whole and estimate the cost of a plan to divide a parcel from Polpis for Arne to sell to the Land Bank. Id. at 2-3.

17. On March 10, 1989, Chaplin sent a letter to Puzo in response to the March 3, 1989 letter. Ex. 3. The letter expressed concern that "our worst fears have been realized that Arne would raise the specter with the Land Bank that some or all of Polpis is 'for sale' when it most emphatically is not." Ex. 3 at 1. The letter stated that Arne was free to retain Czupryna's services on his own, but that Reb continued to believe an appraisal would be too speculative to be useful. Id. at 1-2. The letter also stated that Reb was willing to undergo substantial financial sacrifice to permit Arne to withdraw from his joint beneficiary status as to Polpis on the basis of what Reb believed to be a "very liberal valuation . . . of the development potential of Polpis in 2010" and that Reb will "protect Arne if events prove [Reb's estimated] valu[ation] to be to have been too conservative." Id. at 2. Reb testified that he does not recall what was meant by the word "protect" as the term was used in the March 10, 1989 letter. Tr. 1:69-70.

18. Reb and Arne subsequently agreed to hire Czupryna jointly to appraise Polpis. Tr. 1:71-72.

19. Arne testified that by March of 1989 negotiations had stalled over price in the absence of an appraisal. Tr. 2:10. On March 17, 1989, Arne sent a handwritten letter to Reb and Chaplin, stating "I thought you might be interested in this letter I am sending next Friday if significant progress cannot be achieved." Ex. 51. To this letter, Arne attached a typed letter, addressed to the director of the Land Bank, proposing that Arne sell his one-third interest in Polpis to the Land Bank, stating that the Trust beneficiaries had received an offer of $6 million to sell Polpis to a developer

who wanted to build a golf course and 30 residential units on the site, and concluding as follows:

"I hope that the wheels of litigation, partition, and development can be prevented from starting. As you know, they can be very difficult to stop." Ex. 28 at 2. When asked at trial whether the handwritten letter was intended as a threat, Arne replied, "I don't know. Does it sound threatening? . . . I don't know, pretty mild threat. . . . It was intended to get some action, yeah." Tr. 2:11-12.

20. Arne signed a typed letter, dated June 27, 1989, addressed to the editor of Nantucket's newspaper, the Inquirer and Mirror. Ex. 52. The letter states that Reb and Arne had received in their capacity as Trust trustees an offer from a developer to buy Polpis and build a golf course and residential units on the site, that Arne preferred to sell his interest in Polpis to the Land Bank, that Reb was obstructing Arne's preference, and that if Reb continued to do so then Arne would "go to litigation" in "a process that will take many years and hundreds of thousands of dollars" and would consider partnering with a party that would rather deal with a developer than with the Land Bank. Id. at 1. Arne does not recall if he ever sent the letter to the Inquirer and Mirror or if he ever showed it to Reb. Tr. 2:13.

21. On July 7, 1989, Puzo sent a letter to Chaplin. Ex. 29. The letter stated in part:

> Arne needs to get funds distributed from the . . . Trust presently. He has personal and business needs for cash and also has some debts which need to be taken care of. Arne is working diligently on a number of commercial projects and needs to have cash flow in order to complete them. . . . Arne is seeking a distribution at this time to him of $25,000 from the . . . Trust of which he expects to use $13,000 as part of his offer of settlement to his [then-wife] Llewellyn.

Ex. 29 at 1.

22. On September 7, 1989, Arne wrote a handwritten letter to Dr. Robert Abernathy, a doctor Arne had seen at Reb's behest, asserting that Arne would sue Reb and Reb's wife for refusing to allow Arne to sell his interest in Polpis to the Land Bank, asserting further that Dr. Abernathy was

"certain to be logging more court time than you would care to," and concluding that "you have no idea how upset I can get (and that is not a threat, it's a promise)." Ex. 53 at 1, 4. Arne does not recall if he ever sent the letter to Dr. Abernathy, but he did send copies to Reb and Reb's wife. Tr. 2:13-14.

23. On November 21, 1989, Czupryna produced the appraisal of Polpis ("the Appraisal"). Ex. 17. The Appraisal included a series of valuations of Polpis based on varying assumptions, including one valuation titled "Plan A" that estimated a net value of $4 million for Polpis. Id. at 8. Reb's understanding was that the Appraisal did not take into account any reduction in Polpis' value caused by the restrictions in the Brothers' Agreement. Tr. 1:72-73.

24. On December 8, 1989, Puzo sent Chaplin a letter regarding settlement possibilities between Arne and Reb in light of the Appraisal. Ex. 4. The letter stated that Arne proposed to sell his interest in Polpis to Reb for $1.33 million, minus $100,000 owed by Arne to Reb, minus an additional $25,000 to compensate Reb for Reb's services to the Trust, for a rounded net sale price of $1.2 million, with "no expectation on Arne's part that he would share in the ultimate disposition of the Polpis property." Id. at 2.

25. On January 5, 1990, Puzo sent Chaplin another letter. Ex. 5. The letter indicated that after Puzo sent his December 8, 1989 letter, Puzo and Chaplin had a conversation during which Chaplin suggested that Arne's asking price should be lower than $1.2 million to account for the Brothers' Agreement, which reduced the value of Polpis in a manner unaccounted for in the Appraisal. Id. at 1. The letter stated that despite this conversation, Puzo believed Arne's proposed price was "a fair one." Id. The letter also stated that, as an alternative to the net $1.2 million proposal, Arne proposed to sell his interest in Polpis to Reb for $1.33 million, minus $100,000 owed

by Arne to Reb, minus an additional $30,000 to compensate Reb for his services to the Trust, minus the value of two house lots to be retained by Arne and valued in the Appraisal at $360,000 each, for a net sale price of $480,000 plus two house lots. <u>Id.</u> at 2. The letter also reiterated that "Arne's desire is to make a clean break with respect to his interest in Polpis." <u>Id.</u> at 1.

26. On January 26, 1990, Chaplin sent Puzo a letter in response to Puzo's January 5, 1990 letter. Ex. 6. Chaplin's letter purported to identify remaining areas of disagreement between Reb and Arne, namely, the number of house lots sought by Arne (the letter asserted that the Brothers' Agreement entitled Arne to one house lot, not two), the money to which Reb was entitled as a result of his services to the Trust (the letter stated that Reb would accept $125,000 rather than the $30,000 proposed by Arne) and the proper valuation of Polpis accounting for the encumbrance of the Brothers' Agreement (the letter asserted that Arne's proposed starting price of $1.33 million should be discounted by one-third to account for the encumbrance, to a rounded starting price of $890,000). <u>Id.</u> at 2-3. The letter also stated that Reb believed that the Brothers' Agreement precluded Arne from selling one-third of Polpis to a third party and stated further that an "ex parte sale to a conservation organization . . . would confer an unintended windfall benefit upon Arne, as pointed out to you in an earlier letter." <u>Id.</u> at 2.[5] The letter also stated that, in order to reach a settlement, Reb was willing to oversee the subdivision of a single 3-to-5 acre lot from Polpis to be offered on the open market at a price of $250,000 to $350,000, the net proceeds going to Arne and was willing to buy Arne's remaining interest in Polpis for an additional $250,000 and to forgive Arne's

---

[5] The mention of an "earlier letter" appears to be a reference to Chaplin's February 9, 1989 letter, Ex. 1, discussed in paragraph 14 above. The specific term "windfall" is not mentioned in Chaplin's February 9, 1989 letter nor in any other of Chaplin's letters that predate his January 26, 1990 letter and that are in the record. <u>See</u> Exs. 1, 3, 25, 27.

indebtedness to Reb.  Id. at 3-4.  Reb testified that by January 26, 1990, Reb was well aware that Arne had significant financial issues and that Reb had loaned and planned to continue to loan Arne money.  Tr. 1:76.  Arne testified that as of January 26, 1990, he had no expectation that Reb would put Polpis on the market.  Tr. 2:20.

27.  On February 12, 1990, Puzo sent Chaplin a letter in response to Chaplin's January 26, 1990 letter.  Ex. 30.  The letter included two alternative settlement proposals.  Id. at 1.  The first proposal was a modification of the two-house-lots proposal included in Puzo's January 5, 1990 letter; under the modified proposal Arne would sell his interest in Polpis to Reb for $1.33 million, minus $125,000 owed by Arne to Reb (as opposed to $100,000 in the January 5, 1990 proposal), minus an additional $50,000 to compensate Reb for his services to the Trust (as opposed to $30,000 in the January 5, 1990 proposal), minus an additional $5,000 for Reb's legal fees, minus the value of two house lots to be retained by Arne and valued in the Appraisal at $360,000 each, for a net sale price of $430,000 plus two house lots.  Id. at 1.  The second proposal purported to be responsive to Reb's assertion that Arne's proposed valuation of Polpis should be reduced by one-third; the letter stated that "[w]hile Arne cannot accept your argument that the proposed discount is appropriate, we have an offer which is the economic equivalent," to wit, "Arne will 'trade' the one-third 'discount' up front . . . for a continuing one-ninth participation going forward."  Id. at 1-2.  The letter asserted that "Arne's remaining interest in the Polpis land would . . . avoid the possibility of the undesired 'windfall.'"  Id. at 2.  Under the second proposal, Arne would take his preferred valuation of his share of Polpis, $1.33 million, subtract $125,000 owed by Arne to Reb, subtract an additional $50,000 to compensate Reb for services to the Trust, subtract an additional $5,000 for Reb's legal fees, and would receive two-thirds of the remaining $1.15 million – that is, $766,667 – "preferably

by way of the desired two lots valued at $720,000, with the balance to be paid in cash," or, alternatively, "Arne would take one lot to be mutually determined, at a value as suggested by you of $250,000 – $350,000, with the balance of $416,667 to $516,667 to be paid over five to seven years with interest." Id. at 2.

28. On February 20, 1990, Chaplin sent Puzo a letter rejecting the proposals in Puzo's February 12, 1990 letter. Ex. 31. The letter stated that, "[i]f you want, Reb will renew his most recent offer, as set forth in my letter of January 26[,] 1990, for some reasonable period of time while Arne decides whether to accept the premise of impaired marketability. Otherwise, we have no suggestions for ending the impasse which has developed." Id. at 2.

29. On February 22, 1990, Puzo responded to Chaplin. Ex. 7. The letter stated that Puzo "d[id] not want to get mired down in the discount versus no discount morass," but "d[id] want to get this case settled." Id. at 1. The letter set forth a new proposal, wherein Arne would start with the $1.33 million figure, reduce it by $200,000, "that being a reduction of slightly in excess of 15% of the gross amount." Id. The proposal then subtracted $125,000 for Arne's indebtedness to Reb, subtracted another $50,000 to compensate Reb for services to the Trust, and subtracted $5,000 for Reb's legal fees, leaving a remainder of $950,000 "which Arne would have paid to him in cash . . . and in kind, specifically by way of land transfer. If, for example, Arne were to take two building lots valued at $720,000, the cash portion would be $230,000. If the land to be transferred were to be of a lower value, the cash would have to be commensurately higher." Id. The letter also stated that "[w]e would also expect to work with you and Reb to obtain for Arne 'upside protection' should Reb's purchase of Arne's share of the common land yield to Reb an unintended windfall." Id.

30.  On March 9, 1990, Puzo sent Chaplin a letter, Ex. 32, that set forth a new proposal, wherein Arne would start with the $1.33 million figure, set aside $270,000 as a discounted value for Arne's house lot, and would discount the remaining $1.03 million by one-third to $690,000 (as opposed to the 15% reduction proposed in the February 22, 1990 letter), which added back to the discounted value of Arne's house lot would yield a total of $960,000 of value due to Arne; from this total Arne would subtract $150,000 for Reb's legal fees and services to the Trust (compared to $55,000 for these amounts proposed in the February 22, 1990 letter) and would subtract an additional $110,000 owed by Arne to Reb (compared to the $125,000 for this amount proposed in the February 22, 1990 letter), yielding a balance of $700,000 to be transferred to Arne (compared to $950,000 for this amount proposed in the February 22, 1990 letter).  Id. at 1.  The letter stated that the $700,000 would be transferred through a transfer of land worth approximately $300,000 and a cash transfer for the remaining $400,000.  Id.

31.  In a March 13, 1990 letter, Chaplin responded to Puzo, stating that "Reb is not prepared to accept the terms of 'settlement' you propose, nor is he prepared to modify his own position."  Ex. 33 at 1.

32.  On March 20, 1990, Puzo responded to Chaplin by letter, Ex. 8, stating that "I would recommend to Arne that he agree to a compromise which would see him receive $625,000 in cash and kind for his interest in the Polpis land."  Id. at 1.  The letter stated further that, "[g]iven the amount of this settlement, Arne would expect to share in some mutually agreed upon way in what might otherwise be unintended windfall down the road on account of Reb's purchase of Arne's Polpis interest."  Id.  Arne testified that he understood that as of March 20, 1990, the definition of "windfall" remained to be agreed upon by the parties.  Tr. 2:20-21.

33.  On March 26, 1990, Chaplin sent Puzo a letter, Ex. 9, responsive in part to Puzo's March 20, 1990 letter.  Chaplin's letter states that "I am willing to recommend the figure of $625,000 in cash and kind as a valuation of Arne's encumbered interest in Polpis provided there is before me a detailed agreement, otherwise acceptable to me, which Arne has signed and lacks only Reb's signature to be effective."  Id. at 1 (emphasis in original).  The letter stated further that "Reb has no desire . . . to receive a windfall at Arne's expense," and that in any forthcoming agreement "a provision such as the following would be acceptable":

> This agreement has been negotiated upon the assumption that the fair market value of Arne Jensen's interest in Polpis would be $1,130,000.00 if that interest were unencumbered by the provisions of the [Brothers'] Agreement and certain other obligations.  That amount has been reduced to $625,000.00 on account of the very substantial discount which would occur if Arne were to try to sell that interest on the open market, pre-existing indebtedness from Arne to [Reb], and the latter's legal fees.  Should [Reb] hereafter participate in a sale of the development rights in portions of Polpis aside from his own house lot and one for Bonnie, he recognizes an obligation to pay his brother as additional compensation hereunder such monies as he ([Reb]) determines in his good faith discretion represent any windfall value he might unintentionally be receiving at that time in what would have been Arne's one-third share of those lands.  [Reb's] determination of his liability to Arne under this paragraph shall be final and conclusive upon the parties.

Id. at 2.

34.  On April 19, 1990, Arne signed the bottom of Chaplin's March 26, 1990 letter beneath a typed statement that the content of the letter was "agreed to in principle."  Ex. 9 at 3.

35.  On April 27, 1990, Chaplin sent Puzo a letter "to confirm what I understand to be an agreement in principle as to the resolution of all outstanding matters between my client, Reb Jensen, and your client, Arne Jensen."  Ex. 10 at 1.  The letter stated that to satisfy Arne's right under the Brothers' Agreement to have a portion of Polpis held separately pursuant to the Brothers' Agreement, "the Trust will promptly subdivide the Polpis property so as to create a separate

buildable lot having an estimated market value of $300,000 ('Arne's house lot')," and that "Arne's

house lot will then be offered for sale by the Trust, and the net proceeds will be distributed to

[Arne]."  Id.  The letter stated further that Reb would purchase Arne's undivided interest in the

remainder of Polpis for $325,000.  Id.  The letter also stated in numbered paragraph 5 that

> This agreement has been negotiated upon the assumption that the fair market value
> of Arne's interest in Polpis would be $1,130,000.00 if that interest were
> unencumbered by the provisions of the [Brothers'] Agreement and certain other
> obligations.  That amount has been reduced to $625,000.00 on account of the very
> substantial discount which would occur if Arne were to try to sell that interest on the
> open market; pre-existing indebtedness from Arne to Reb; the latter's legal fees
> incurred at Arne's initiative; and the value which Reb has added to [the] Trust . . .
> . Should Reb hereafter participate in a sale of the development rights in portions of
> Polpis aside from his own house lot and one for Bonnie, he recognizes an obligation
> to pay his brother as additional compensation hereunder such monies as he (Reb)
> determines in his good faith discretion represent any windfall value he might
> unintentionally be receiving at that time in what would have been Arne's one-third
> share.  Reb's determination of his liability to Arne under this paragraph shall be final
> and conclusive upon the parties.

Id. at 3.  Arne testified that as of April 27, 1990, it was clear to him that a determination of any

windfall would be made by Reb, not by a court.  Tr. 2:27.

36.  On April 30, 1990, Chaplin sent Puzo a letter, purportedly in response to a phone

conversation between Puzo and Chaplin on April 25, 1990 about whether Reb would be willing to

lend Arne $100,000 against the sales price of Arne's house lot to help Arne pay his divorce

settlement.  Ex. 34.  The letter stated that "Reb wants to take matters a step at a time," id. at 1, and

that if Reb and Arne reach final agreement as to the sale of Arne's interest in Polpis, then Reb would

be prepared to advance Arne $50,000, but that "[f]inalization of this accommodation to Arne would

depend on a firm agreement as to the Polpis buyout."  Id. at 2.

37.  On May 11, 1990, Puzo sent Chaplin a letter that set forth details regarding Reb's

$50,000 advance to Arne.  Ex. 11 at 1-2.  The letter also stated that:

While any number of issues are going to require substantial attention as we proceed towards definitive documents, one item draws my particular interest. We shall have to agree upon some sensible way to avoid the unintended windfall which is the subject of paragraph 5 of your April 27, 1990 letter should that windfall occur after Reb's death. So long as this decision is being made by Reb, the parties should have no concern. If the decision is, however, to be made by a fiduciary, it will no doubt be necessary to provide some more guidance than is in your letter. In any event, I am confident that this is something which we can work out readily in the course of preparing definitive documents. I believe that the foregoing modifications constitute the only changes which we will require from your April 27 proposal.

Id. at 2.

38. Additionally, also on May 11, 1990, Arne signed the bottom of Chaplin's April 27, 1990 letter beneath a typed statement that the content of the letter was "approved as of April 27, 1990, as modified by correspondence of [Puzo] to [Chaplin] dated May 11, 1990." Ex. 10 at 3.

39. On May 15, 1990, Chaplin sent Puzo a letter in response to Puzo's May 11, 1990 letter. Ex. 35. The letter discussed ways in which Reb could facilitate Arne's request that Reb expedite his advance to Arne; this letter did not discuss the windfall issue. Id.

40. On May 24, 1990, Morse sent Chaplin a letter stating that Morse and Puzo agreed that going forward Morse would take the lead role in Arne's representation. Ex. 12. The letter also asked, regarding the issue of how to proceed if "the definition of a 'windfall sale'" were to be "made by Reb's representatives or devisees following his death[:] Would it be feasible to define such a windfall as a sale for a price of not less than $4,500,000 increased in some manner to cover inflation in the future?" Id. at 2.

41. On June 6, 1990, Chaplin sent Morse a letter that discussed various options for Reb sending an advance to Arne and for Arne repaying the advance. Ex. 36. The letter did not discuss the windfall issue. Id.

42.  On June 11, 1990, Chaplin sent Morse a fax purporting to follow up upon a phone conversation between Chaplin and Morse held earlier that morning.  Ex. 37 at 1.  The fax included a typed document entitled "Draft 5" of an agreement between Reb, Arne and Bonnie, with handwritten edits on the document, including one edit striking out the "5" in "Draft 5" and replacing it with a "6."  Id. at 2.  In relevant part, the typed document states:

> 1.  For the sum of six hundred and twenty five thousand dollars ($625,000.00) Reb hereby agrees to purchase, and Arne agrees to sell, the latter's one-third undivided beneficial interest in [Polpis].
> . . .
> 21.  It is contemplated by the parties that Bonnie and Reb, after creating house lots for themselves within the meaning of the [Brothers'] Agreement, may jointly sell[6] to a conservation agency or organization the development rights (meaning the rights to create additional residential lots) to the remaining property or to take[7] jointly equivalent steps such as restricting the bulk of Polpis to agricultural uses.  It is agreed by the parties that the $1,330,000.00 in value, which each of them might enjoy were Polpis to be divided into three separate unrestricted parcels at this time, would roughly consist of some $600,000.00 as the value of a "house lot" and some $730,000.00 as the value of the remainder.  If, as and when Reb and Bonnie should come to sell the development rights[8] to all of Polpis except their house lots, Reb recognizes a moral obligation to Arne to compare one half of his share of the sales price with the 1990 imputed present-value basis of $730,000.00, and to compensate Arne further at that time should that comparison disclose that Reb had obtained a windfall at that time considering intervening inflation, predictable long-term increases in the value of vacation property on Nantucket and the fact that Reb is assuming the entire pecuniary risk as to the future value of Polpis as between himself and Arne.  Should Reb be deceased or disabled at that time, his legal representatives shall consult with [Chaplin] in the course of determining whether there is a windfall profit to be shared with Arne.

Id. at 4, 7-8.  This letter contains the first appearance of the term "moral obligation" in the record before the Court.  Reb testified that he does not know how the words "moral obligation" made their

---

[6] Here, a handwritten edit changes the phrase "may jointly sell" to "may agree jointly to sell." Ex. 37 at 7.

[7] Here, a handwritten edit changes the phrase "or to take" to "or may agree to take."  Ex. 37 at 7.

[8] Here, a handwritten edit changes the phrase "the development rights" to "the rights."  Ex. 37 at 8.

way into the agreement.  Tr. 1:53.  He testified further that the term was intended to state Reb's good

faith commitment to fulfill the terms of the agreement, but that he did not intend Paragraph 21 of

the agreement to be legally enforceable.  Tr. 1:54-55, 1:113.  Chaplin testified that he remembered

the expression "moral obligation" being a part of the negotiations from the very beginning and

recalled that the term was in the initial draft agreement, but is aware that despite his recollection

there is no documentation of that term prior to his June 11, 1990 letter.  Tr. 2:76-77, 2:92.

43.  Later on June 11, 1990, Chaplin sent by hand a document entitled "Draft 7" of the

agreement to Puzo.  Ex. 38.  In relevant part, the document states:

> 2.  For the sum of three hundred and twenty five thousand dollars ($325,000.00) Reb
> hereby agrees to purchase, and Arne agrees to sell, the latter's one-third undivided
> beneficial interest in [Polpis].[9]
>  . . .
> 21.  It is contemplated by the parties that Bonnie and Reb, after creating house lots
> for themselves within the meaning of the [Brothers'] Agreement, may agree jointly
> to sell to a conservation agency or organization the development rights (meaning the
> rights to create additional residential lots) to the remaining property or may agree to
> take jointly equivalent steps such as restricting the bulk of Polpis to agricultural
> uses.[10]  It is agreed by the parties that the $1,330,000.00 in value, which each of them
> might enjoy were Polpis to be divided into three separate unrestricted parcels at this
> time, would roughly consist of some $600,000.00 as the value of a "house lot" and
> some $730,000.00 as the value of the remainder.  If, as and when Reb and Bonnie
> should come to sell the rights[11] to all of Polpis except their house lots, Reb
> recognizes a moral obligation to Arne to compare one half of his share of the sales
> price with the 1990 imputed present-value basis of $730,000.00, and to compensate
> Arne further at that time should that comparison disclose that Reb had obtained a
> windfall at that time considering intervening inflation, predictable long-term
> increases in the value of vacation property on Nantucket and the fact that Reb is

---

[9] The change from the $625,000 figure in Drafts 5 and 6 to the $325,000 figure in Draft 7
appears to be related to the inclusion of a new Paragraph 1 in Draft 7 that specifically addresses
the Trust's intent to sell Arne's house lot with an estimated market value of $300,000.  Ex. 38 at
5.

[10] Here, a handwritten note states "Q - delete this sentence?"  Ex. 38 at 14.

[11] Here, a handwritten note circles the phrase "the rights" and annotates it with a question mark.
Ex. 38 at 14.

assuming the entire pecuniary risk as to the future value of Polpis as between himself and Arne. Should Reb be deceased or disabled at that time, his legal representative(s) shall consult with [Chaplin] in the course of determining whether there is a windfall profit to be shared with Arne.

Id. at 6, 13-14.

44. On June 13, 1990, Chaplin sent Morse a letter purporting to enclose a final version of the proposed agreement between Reb, Arne and Bonnie. Ex. 13.[12] The letter stated that "[w]hile this is not a 'drop dead' proposal, you and Arne should understand that it is the only form of agreement which Reb is prepared to execute at this time. Other possible approaches . . . would lead, at best, to a new round of negotiations." Id. at 1. The letter also stated:

I trust that, on reflection, you will be able to recommend this Agreement to Arne which assures him of $625,000.00 less the cost of creating and selling off a residential lot on his behalf. Given the impaired marketability of Arne's interest in Polpis and his pressing and self-imposed financial commitments, it appears to extricate him from a very awkward situation. At the same time Reb is making him a moral commitment to share any windfall which might unexpectedly result from the acquisition of Arne's interest in Polpis less a house lot. I will speak to Reb about [Puzo]'s request that the moral commitment be reflected in a codicil to Reb's will. As the Agreement indicates, it is Reb's clear intention that the moral obligation be carried out by his legal representatives should he die before there has been an ultimate disposition of Polpis.

Id. at 2. The letter concluded with Chaplin stating to Morse that "[o]n a personal note, I appreciate the lawyerly and harmonious manner in which you and Mike [Puzo] have conducted this negotiation. I trust it is now at an end." Id.[13]

---

[12] The record before the Court does not include the document that was enclosed with Chaplin's June 13, 1990 letter.

[13] Unfortunately, as evidenced by this litigation, which was initiated nearly twenty years after the execution of the June 22, 1990 Agreement, the end of the dispute over Polpis remained elusive despite the best efforts of counsel.

45.  On June 22, 1990, Reb, Arne and Bonnie executed the June 22, 1990 Agreement, Ex. 15 at 17, initialing each page thereto.  Id. at 1-17.  The language in paragraphs 2 and 21 in the June 22, 1990 Agreement was identical to the language in paragraphs 2 and 21 in the "Draft 7" document sent by Chaplin on June 11, 1990, Ex. 15 at 4, 12-13; Ex. 38 at 6, 13-14, including the statement "[i]f, as and when Reb and Bonnie should come to sell the rights to all of Polpis except their house lots, Reb recognizes a moral obligation to Arne to compare one half of his share of the sales price with the 1990 imputed present-value basis of $730,000.00, and to compensate Arne further at that time should that comparison disclose that Reb had obtained a windfall at that time." Ex. 15 at 12-13, Ex. 38 at 14.  Chaplin testified that he intended the windfall language in the June 22, 1990 Agreement to mean that whatever determinations Reb made would be final and conclusive and was designed to preclude Arne from going to court.  Tr. 2:72.  Arne testified that when he read the June 22, 1990 Agreement, he understood that the determination of any windfall was left to Reb.  Tr. 2:31.  Arne also testified that he does not remember there being any contingency or stipulation about Reb selling Polpis in the June 22, 1990 Agreement, but that it was not his intent that every last bit of the non-house-lot portions of Polpis had to be sold before Arne participated in any upside; he testified that he thought it would be sold in a timely manner and that as it was sold Arne would participate in upside profits.  Tr. 2:34.

46.  On June 26, 1990, Morse sent Chaplin a signed copy of a memorandum of understanding between Morse and Chaplin regarding the proper interpretation of certain clauses in the June 22, 1990 Agreement.  Ex. 39.  The memorandum focused solely on issues relating to the speed with which Arne could receive his first payments under the June 22, 1990 Agreement and did not address the concepts of "moral obligation" or "windfall" or the "if, as and when" clause as these phrases

23

were used in Paragraph 21 of the June 22, 1990 Agreement. Id. at 2-3  On July 9, 1990, Morse faxed Chaplin a draft revision to the June 26, 1990 memorandum and the revision likewise addressed only the schedule of payments to Arne and did not discuss the concepts of "moral obligation" or "windfall" or any "if, as and when" language. Id. at 4-6.

47.  On July 12, 1990, Morse sent Chaplin a letter purporting to memorialize a phone conversation between Morse and Chaplin that led to a mutual understanding that if the June 26, 1990 memorandum of understanding was in any way inconsistent with the June 22, 1990 Agreement, the June 22, 1990 Agreement would govern. Ex. 40.  This letter also did not discuss the concepts of "moral obligation" or "windfall" or the "if, as and when" clause as these phrases were used in the June 22, 1990 Agreement. Id.

48.  On January 4, 1991, Reb and Arne entered into an agreement amending the June 22, 1990 Agreement. Ex. 41.  The amendment addressed the allocation of certain funds to which Arne was entitled under the terms of the June 22, 1990 Agreement and did not concern the concepts of "moral obligation" or "windfall" or the "if, as and when" clause as these phrases were used in the June 22, 1990 Agreement. Id. at 1-5.

**B.      Parties' Conduct After the June 22, 1990 Agreement**

49.  On May 27, 1997, Reb, acting as sole trustee of the Trust, sold a portion of Polpis to Robert Stark for $450,000. Ex. 22.

50.  On February 21, 2001, Reb, acting as sole trustee of the Trust, sold a portion of Polpis to the Nash Nominee Trust II for $37,500. Ex. 18.

51.  On June 19, 2001, nearly eleven years after the adoption of the June 22, 1990 Agreement, Morse sent a letter to Chaplin, Ex. 42, that stated in relevant part:

[w]ith respect to the [June 22,] 1990 Agreement, I draw your attention to Paragraph 2 covering Arne's sale to Reb of his interest in [Polpis] for $325,000 and Paragraph 21 covering the moral obligation on Reb's part. I also remind you that an appraisal of this property as of November 21, 1989 was made by Jim Czupryna in the amount of $4,000,000 [sic]. That explains the one-third value of $1,330,000 described in Paragraph 21 and suggests that Arne's sale for $325,000 was a bargain sale for reasons that Arne and undoubtedly Reb remember better than I do. Getting back to Paragraph 21, Arne is suggesting and requesting that in light of the dramatic increase in the value of this land since 1990, Reb now determine and agree to pay to Arne an equitable percentage of the net proceeds which may be realized in the event of a sale or other disposition of this land at a future time. Such an undertaking by Reb at this time while all of us are available and of sound mind has the obvious advantage of resolving a question which will surely be raised at a future time in the event of such sale or other disposition.

Id. at 1-2.

52. On June 28, 2001, Chaplin sent a letter to Morse in response to Morse's June 19, 2001 letter. Ex. 43. The letter reflected Reb's negative response to Morse's letter. Id. at 1. The letter stated further:

[Y]our suggestion of trying to set an "equitable percentage" for Arne at this time is wholly at variance with the concept of a "windfall." There is absolutely no way to know at this point whether there will ever be a windfall. Indeed, the probability is that there will not be one given the fact that Paragraph 21 specifically states that any windfall is to be determined after considering "intervening inflation, predictable long-term increases in the value of vacation property on Nantucket and the fact that Reb [has] . . . assumed the entire pecuniary risk as to the future value of Polpis as between himself and Arne." In the second place, any determination as to the existence or non-existence of a windfall can only be made after a disposition of Reb's interest has actually occurred. In short, it is premature to try to establish whether a windfall has occurred until Reb (or his successors) have actually delivered a specific return on the property. Without knowing the price of a sale or other disposition, one cannot even begin to think about a percentage, IF ANY, which it might be equitable to award Arne. So Reb and I regard the subject moot until there has been an actual transfer of title to some third person.

Id.

53. On August 25, 2004, Reb, acting as sole trustee of the Trust, sold a portion of Polpis to Carl and Barbara Jelleme for $150,000. Ex. 19.

25

54.  On December 13, 2005, Reb, acting as sole trustee of the Trust, sold a portion of Polpis to the Nantucket Conservation Foundation for $150,000.  Ex. 23.

55.  On December 16, 2005, Reb, acting as sole trustee of the Trust, conveyed a portion of Polpis to himself in his individual capacity and his capacity as a Trust beneficiary for non-monetary consideration, as a distribution from the Trust to a Trust beneficiary.  Ex. 20.

56.  On December 26, 2005, Reb, acting as sole trustee of the Trust, conveyed a portion of Polpis to the Nantucket Conservation Foundation for non-monetary consideration as a contribution to the Nantucket Conservation Foundation for its general charitable and exempt purposes.  Ex. 21. Reb testified that the value of the gift was $525,000, which Reb could use to reduce his tax burden for the year.  Tr. 1:65, 1:67.

57.  Reb did not notify Arne of his various post-1990 sales of portions of Polpis and thought there was no need to do so.  Tr. 1:105.

58.  The Trust has not yet sold all of Polpis exclusive of Reb and Bonnie's house lots.  Tr. 1:138.

59.  On June 9, 2010, nearly nine years after Morse's June 19, 2001 letter and nearly twenty years after the June 22, 1990 Agreement, Arne filed this action asserting that Reb is legally obligated to compensate Arne upon a windfall, that Reb is obligated to use reasonable efforts to sell Polpis, and that Reb has violated these obligations.  D. 2-1 at 1-13.  In the trial record before the Court, this is the first instance of Arne asserting that Reb has violated his duties under the June 22, 1990 Agreement.  Arne testified that prior to this legal action, no one has asserted on his behalf that Reb had an obligation to sell Polpis.  Tr. 2:37.  Morse testified via stipulation that at no time did he

demand of Reb that Reb sell Polpis and that he never contended to Reb or to Chaplin that Reb had a legal obligation to sell Polpis. D. 65 at 1.

60.    Reb testified that his goal when negotiating the June 22, 1990 Agreement was to satisfy Arne that Reb was doing all he could to speed up the Trust's money-producing activities associated with non-Polpis property and to explain that Polpis property was subject to the Brothers' Agreement as to how to deal with Polpis in the event of a sale. Tr. 1:156. He testified further that he wanted to see if there was any way he could help Arne and to lessen distractions as far as the non-Polpis property was concerned, and to get agreement about an understanding as to the situation with Polpis and the restrictions in the Brothers' Agreement. Tr. 1:157-58. He also testified that one of his goals for the negotiations was to improve his relationship with Arne, which he thinks is the only goal he had for the negotiations that was not accomplished. Tr. 1:158, 178-79. He testified that he has no recollection of any conversations he had with Chaplin in 1988, 1989 or 1990 beyond the information contained in the written documents filed with the Court, Tr. 1:40, and repeatedly testified that as a general matter he has no specific memories about the negotiation process other than what is reflected in the contemporaneous documents. Tr. 1:40, 1:49-51, 1:56, 1:58-59, 1:70, 1:73-74, 1:76-77, 1:81-82, 1:87, 1:100-02, 1:159, 1:161, 1:170, 1:179.

61.    Arne, like Reb, testified that he had little recollection of the negotiation process other than what is reflected in the contemporaneous documents. Tr. 2:24-25.

62.    Chaplin, like Arne and Reb, repeatedly testified that he had little or no recollection beyond the contemporaneous documents and that "the letters speak for themselves." Tr. 2:43, 2:49-50, 2:57, 2:62, 2:75-76, 2:78, 2:85.

63.  Puzo and Morse testified via stipulation that they have no memory of the specifics of any conversations in 1989 or 1990 relating to the negotiations leading to the June 22, 1990 Agreement.  D. 65 at 1.

## IV.  Conclusions of Law

In light of the findings of fact enumerated above, the Court makes the following conclusions of law.

### A.  The Contractual Language at Issue

64.  The legal dispute presently before the Court is the disagreement between Arne and Reb over the proper interpretation of the following language from Paragraph 21 in the June 22, 1990 Agreement:  "If, as and when Reb and Bonnie should come to sell the rights to all of Polpis except their house lots, Reb recognizes a moral obligation to Arne to compare one half of his share of the sales price with the 1990 imputed present-value basis of $730,000.00, and to compensate Arne further at that time should that comparison disclose that Reb had obtained a windfall at that time."  Ex. 16 at 12-13.

65.  Specifically, Arne and Reb disagree as to whether Reb's "moral obligation" is legally enforceable (as Arne argues) or is left to Reb's discretion and not judicial determination (as Reb argues), and as to whether the "if, as and when" language creates a condition precedent (as Reb argues) or creates an implied obligation on Reb's part to try to sell all of the non-house-lot property in Polpis  (as Arne argues).

### B.  Interpreting Contractual Language

66.  The issue of whether contract language is ambiguous is a question of law for the court. LPP Mortg., Inc. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009).  A contract is "only ambiguous

'where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998) (quoting Coll v. PD Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995). When faced with ambiguous contract language, courts are free to "hear[] extrinsic evidence," including witness testimony, regarding "the parties' intent." LPP Mortg., 565 F.3d at 30. Additionally, in certain cases, "extrinsic evidence can be offered to show that seemingly plain language, in the circumstances, conceals an ambiguity." Id. at 31-32.

67. As the Court noted in its earlier ruling, the "moral obligation" contractual language at issue here is ambiguous, Jensen I, 2011 WL 2174898, at *4-*7, and while the "if, as and when" language at issue seems at first blush to be plain–i.e., that Reb may, but is not required to, sell Polpis–extrinsic evidence of Arne and Reb's intent could reveal an ambiguity, especially given the ambiguity inherent in the related moral obligation clause. Id. at *7.

68. Types of extrinsic evidence used to resolve contractual ambiguities include, "in descending order of importance," (1) the parties' negotiations concerning the contract at issue, (2) the parties' course of performance, and (3) trade usage in the relevant industry. Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999). Here, only the first two types of evidence are applicable (since the parties are private non-commercial actors) and post-contractual performance will be accorded less weight than the negotiations leading to contract formation.

69. "[A] court should first attempt to discover from extrinsic evidence the surrounding circumstances which caused the word to be used," and "[i]f the parties ascribe different meanings, the court must decide whose meaning governs and what that meaning is." Jamesbury Corp. v.

Worcester Valve Co., 443 F.2d 205, 210 n.7 (1st Cir. 1971) (citing 3 Corbin on Contracts, § 536, at 28, 31-32 (1970)). "If a court decides that one party knew of [or] had reason to know what the other party's meaning was, it will apply that meaning." Id. (citing 3 Corbin, supra, § 537, at 44-5).

70. Under Massachusetts law, when contractual language admits more than one interpretation, the contract "is to be construed so as to give it effect as a rational business instrument and in a manner which will effectuate the intent of the parties; the parties intent must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part." Bukuras v. Mueller Group, LLC, 592 F.3d 255, 262 (1st Cir. 2010) (internal citations, quotation marks and alterations omitted) (applying Massachusetts law). "Words that are plain and free from ambiguity must be construed in their usual and ordinary sense, and the agreement should be read in a reasonable and practical way, consistent with its language, background, and purpose." Id. (internal citations, quotation marks and alterations omitted). "Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of cannons." Id. (quoting Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001)).

### C.   The Parties Intended the Execution of Reb's "Moral Obligation" to be Committed to Reb's Discretion

71. The notion of "protect[ing] Arne's upside potential" in his rights to Polpis was first raised by Chaplin on Reb's behalf, in his February 9, 1989 letter that rejected Arne's request that Reb simply buy Arne's interest for $2 million. Instead, Chaplin proposed a less expensive buyout of Arne's interest coupled with Reb's "willing[ness] to protect Arne if the future value of Polpis proves be higher than [Reb] thinks it will be." Ex. 1 at 2, 3. At that point, there was no indication from either Arne or Reb as to whether the proposed upside protection would be committed to Reb's discretion.

72.  Arne responded to this proposal via Puzo's March 3, 1989 letter, in which Puzo states that it was his understanding that Reb was offering a lower buyout price coupled with "<u>Reb's assurance</u> that . . . there would be protection on the upside for Arne."  Ex. 2. at 1-2 (emphasis added).  Via Puzo, Arne rejected Reb's offer.  This language aids the position that Arne's upside protection as discussed in the letters between Chaplin and Puzo was a matter of Reb's discretion, and detracts from the notion that judicially determined upside protection was important to Arne, at least at this early stage of the negotiations.

73.  Chaplin replied on March 10, 1989 that Reb was willing to facilitate Arne's exit from Polpis as encumbered by the Brothers' Agreement, and that Reb "will even protect Arne if events prove [Reb's] valu[ation] [of Polpis] to have been too conservative, <u>and</u> he is willing to take the downside risk."  Ex. 3 at 2 (emphasis in original).  There was no specific indication in this communication as to whether "upside protection" for Arne was matter of Reb's discretion.

74.  On December 8, 1989, after Czupryna had conducted the Appraisal, Puzo again proposed that Reb buy out Arne's interest, this time for the lower figure of $1.2 million, with "no expectation on Arne's part that he would share in the ultimate disposition" of Polpis.  Ex. 4 at 2.  Reb, via Chaplin, rebuffed this offer.  Ex. 5 at 1.

75.  On January 5, 1990, Puzo proposed that Reb buy out Arne's interest for $480,000 plus two house lots, and did not seek any continuing interest (with or without upside protection) for Arne, Ex. 5 at 2, since "Arne's desire is to make a clean break with respect to his interest in Polpis." <u>Id.</u> at 1.

76.  Chaplin's letter in response, dated January 26, 1990, included the first mention of a "windfall," although in a form quite different from the windfall provision currently at issue:  Reb

was concerned that if Arne sold his one-third interest in undivided Polpis to a conservation organization at the market price for land that can be developed, the conservation organization would subsequently block any effort to develop Polpis, eroding the value of Reb and Bonnie's interests in Polpis and leaving Arne with an unfair windfall. Ex. 6 at 2. On February 12, 1990, Puzo responded by proposing that Reb buy Arne out at a reduced rate, now $766,667, and require Arne keep a one-ninth interest in Polpis - that is, Arne was offering to take steps to make sure <u>Arne</u> did not accidentally receive an unintended windfall by cashing out of Polpis before its market price fell. Ex. 30 at 1-2. Chaplin rejected the offer on February 20, 1990. Ex. 31.

77. On February 22, 1990, Puzo sent Chaplin another proposal for a full buyout, now $950,000, with Arne retaining no interest in Polpis going forward, and discussed for the first time a "windfall" in the context currently at issue, stating that Puzo and Arne "would expect to work with you and Reb to obtain for Arne 'upside protection' should Reb's purchase of Arne's share of the common land yield to Reb an unintended windfall." Ex. 7 at 1. Again, the notion that Arne expected to "work with" Reb regarding upside protection aids (or at least in no way undermines) the position that such protection was meant to be within Reb's discretion. Chaplin rejected the offer on March 13, 1990. Ex. 33.

78. According to Arne's testimony, as of March 20, 1990, Arne and Reb had yet to reach a shared definition of "windfall." Tr. 2:20-21. On that date, Puzo proposed a full buyout for $625,000 and stated that "Arne would expect to share in some mutually agreed way in what might otherwise be unintended windfall down the road." Ex. 8 at 1.

79. On March 26, 1990, Chaplin responded favorably to the $625,000 offer, reaffirmed that "Reb has no desire to . . . receive a windfall at Arne's expense" and proposed draft language to

memorialize Reb's position in any forthcoming agreement: "[Reb] recognizes an obligation to pay his brother as additional compensation hereunder such monies as he ([Reb]) determines in his good faith discretion represent any windfall value . . . [Reb's] determination of his liability to Arne under this paragraph shall be final and conclusive on the parties." Ex. 9 at 2. This language makes clear that, at least as of March 26, 1990, Reb's intent was for any upside protection to be left to Reb's discretion.

80. On April 19, 1990, Arne signed the bottom of Chaplin's March 26, 1990 letter beneath the statement "agreed to in principle." Ex. 9 at 3. Accordingly, it is beyond dispute that Arne "had reason to know what [Reb]'s meaning was," Jamesbury Corp, 443 F.2d at 210 n.7, at least with regard to the draft agreement language as it stood on March 26 and April 19, 1990.

81. On April 27, 1990, Chaplin sent another letter including essentially identical language stating that the determination of windfall value would be committed finally and conclusively to Reb's good faith discretion. Ex. 10 at 3. Arne testified at trial that as of that date, it was clear to him that any windfall determination would be made by Reb, not a court. Tr. 2:27. This is persuasive evidence that, at least as of April 27, 1990, the parties did not intended the windfall determination to be judicially determined.

82. This conclusion is reinforced by Puzo's subsequent May 11, 1990 letter, in which Puzo asked for additional contractual language regarding the windfall calculation above and beyond the language in Chaplin's April 27, 1990 letter, to help guide the calculation "should that windfall occur after Reb's death," since "if the decision is . . . to be made by a fiduciary [rather than Reb], it will no doubt be necessary to provide more guidance than is in your letter." Ex. 11 at 2. Puzo is clear, however, that neither he nor Arne takes issue with the amount of discretion granted to Reb under

the terms of Chaplin's March 26 and April 27 letters, since Puzo explicitly states that "[s]o long as this decision is being made by Reb, the parties should have no concern." Id. Additionally, Arne signed the bottom of Chaplin's April 27, 1990 letter next to the statement that the letter was "approved as of April 27, 1990, as modified by correspondence of [Puzo] to [Chaplin] dated May 11, 1990." Ex. 10 at 3. Taken together, Puzo's letter and Arne's notation on Chaplin's letter suggest that changes in contractual language from April 27, 1990 to subsequent draft agreements were unlikely to indicate any retreat from the idea that Reb's discretion is final and binding on Arne.

83. Morse's May 24, 1990 letter, which discusses the need to define "windfall" in case the windfall calculation were to be "made by Reb's representatives or devisees following his death," Ex. 12 at 2, reinforces the conclusion that the cause for any changing contractual language regarding the windfall calculation was designed to guide Reb's devisees, not to limit Reb's own discretion or to subject Reb's obligation to calculate a windfall payment to Arne to judicial determination.

84. In the draft agreement circulated by Chaplin on June 11, 1990, Ex. 37, the language regarding the windfall calculation had changed from the "good faith direction[ary]" determination that would be "final and conclusive on the parties" in Chaplin's March 26 and April 27 letters, Ex. 9 at 2, Ex. 10 at 3, to "Reb recognizes a moral obligation to Arne . . . to compensate Arne further . . . should [the newly-enumerated windfall] comparison [method] disclose that Reb had obtained a windfall. . . . Should Reb be deceased or disabled at that time, his legal representatives shall consult with [Chaplin] in the court of determining whether there is a windfall profit to be shared with Arne." Ex. 37 at 7-8. This was the first appearance of the term "moral obligation" in the negotiations. Reb testified that his recollection was that the term was intended to state Reb's good faith commitment to fulfill the terms of any eventual agreement and that the "moral" obligation was

not meant to be a legally enforceable obligation. Tr. 1:54, 1:113. Although the weight of Reb's after-the-fact recollections must be discounted in light of Reb's repeated testimony that he did not recall his thoughts during the negotiations, the Court notes that Reb's recollection on this point is consistent with the letters exchanged between Chaplin, Puzo and Morse prior to the June 11, 1990. Other than the text of the June 11 draft itself, there is no evidence in the record suggesting that the addition of the term "moral obligation" was meant to be a departure from the commitment of the windfall calculation to Reb's discretion as set forth in Chaplin's letters of March 26 and April 27, 1990, and agreed to by Arne on April 19, April 27 and May 11, 1990, respectively. Ex. 9, Ex. 10.

85. Chaplin's June 13, 1990 letter, which discussed the possibility of Reb amending his will to reflect that Reb's "moral commitment" regarding the windfall should be carried out by Reb's legal representatives in the event of Reb's death, Ex. 13 at 1, sheds little additional light on the question of whether that moral commitment was designed to be committed to Reb's discretion.

86. The June 22, 1990 Agreement used "moral obligation" language identical to the language included in the draft agreement circulated by Chaplin on June 11, 1990. Ex. 16 at 12-13, Ex. 38 at 14. Chaplin testified that he intended the windfall language to make Reb's windfall determination final and conclusive and to prevent Arne from going to court, Tr. 2:72; although the weight of Chaplin's after-the-fact recollections, like Reb's recollections, must be discounted in light of Chaplin's testimony that he did not recall his thoughts during the negotiation process, the Court notes that Chaplin's recollection on this point is consistent with the letters exchanged between Chaplin, Puzo and Morse prior to the June 22, 1990 Agreement. Indeed, Arne testified that when he signed the June 22, 1990 Agreement, he understood that the determination of any windfall was left to Reb. Tr. 2:31. This is persuasive evidence in support of Reb's position that the "moral

obligation" language was intended by the parties to commit the windfall determination to Reb's discretion and not judicial determination.

87.    Roughly eleven years passed before Arne or Arne's counsel raised the issue of the windfall calculation with Reb or Reb's counsel.  When the issue was finally broached, in an exchange of letters between Morse and Chaplin in June 2001, Morse requested that Reb perform a windfall analysis, but he couched the request in prudential terms, Ex. 42 at 1-2 ("[s]uch an undertaking by Reb at this time while all of us are available and of sound mind has the obvious advantage of resolving a question which will surely be raised at a future time"), and did not suggest that a court could compel Reb to perform such an analysis, id., and Chaplin responded in a manner consistent with the idea that the windfall issue was entrusted to Reb's discretion.  Ex. 43 at 1 ("Reb and I regard to the issue to be moot until there has been an actual transfer of title").  Further, Arne did not assert that Reb's "moral obligation" was subject to judicial enforcement until he filed the instant action in 2010.  D. 65.  While post-agreement conduct carries less weight in the Court's analysis than the negotiations leading to contract formation, Lanier Prof'l Servs., Inc., 192 F.3d at 4, the June 2001 exchange of letters, coupled with the delay of nearly twenty years between the June 22, 1990 Agreement and Arne's legal action asserting that Reb's "moral obligation" was legally enforceable, does provide additional support to the position that the June 22, 1990 Agreement's "moral obligation" language was intended by the parties to reflect the parties' informal agreement, memorialized in Chaplin's letters of March 26 and April 27, 1990, and agreed to by Arne on April 19, April 27 and May 11, 1990, that Reb's determination regarding a windfall was to be final and conclusive.

88. The extrinsic evidence, reviewed in totality by the Court, supports Reb's position – that the term "moral obligation" as used in the June 22, 1990 Agreement was intended by the parties to mean an obligation that is committed to Reb's discretion and not judicial determination – and precludes Arne's position to the contrary.

89. Arne argues that the only goal of Paragraph 21 of the June 22, 1990 Agreement was to protect Arne against Reb securing an unintended windfall and that interpreting the "moral obligation" clause to render Reb's obligation as precluded from judicial enforcement would be irrational and absurd in light of that goal. Arne's Post-Trial Memorandum of Law, D. 71 at 3-4. Arne points out that under Massachusetts law absurd or irrational interpretations of contractual language – even unambiguous language – are disfavored. Id. at 7 (citing The Cadle Co. v. Vargas, 55 Mass. App. Ct. 361, 366 n. 7 (2002) (observing that "[i]f literalness is sheer absurdity, we are to seek some other meaning whereby reason will be instilled and absurdity avoided") (quoting Outlet Embroidery Co. v. Derwent Mills, Ltd., 254 N.Y. 179, 183 (N.Y. 1930) (Cardozo, C.J.)); 10 (citing Fishman, 247 F.3d at 302 (noting that "[t]he presumption in commercial contracts is that the parties were trying to accomplish something rational"). However, while a judicially enforceable obligation would certainly provide Arne with a level of protection above and beyond a moral obligation committed to Reb's discretion, the latter obligation is no mere makeweight. Reb testified at length about the seriousness with which he regarded his moral obligations. Tr. 1:134-136. More importantly, the record, as discussed more fully above, makes clear on multiple occasions that Arne and his counsel were satisfied to rely on Reb's discretion and saw no need for the additional protection in this regard (e.g., Puzo's May 11, 1990 statement that "[s]o long as this decision is being made by Reb, the parties should have no concern," Ex. 11 at 2; Arne's testimony that he

understood the "moral obligation" language in the June 22, 1990 Agreement to mean that any windfall determination was left to Reb. Tr. 2:{29}). Given that Reb, Arne and Arne's counsel all appear to have agreed (or, at the very least, agreed during the contract formation period) that Reb could be relied upon to discharge his obligations regarding the windfall without judicial oversight, it would be neither absurd nor irrational to interpret the "moral obligation" language to commit the windfall calculation to Reb's discretion.[14]

90. Accordingly, the Court concludes that the term "moral obligation" in Paragraph 21 of the June 22, 1990 Agreement meant that Reb's obligation was committed to his discretion and not judicial determination.[15]

---

[14] Nor is it clear to the Court that protecting Arne's upside potential was the sole purpose of Paragraph 21. Given Arne's time-sensitive financial needs over the course of contract formation and his stated desire to "make a clean break with respect to his interest in Polpis," Ex. 5 at 1, and Reb's repeated efforts during negotiations to consider not only Polpis' value in 1990 but also its difficult-to-estimate possible future valuation and his concern that an improper valuation could result in either Arne or Reb unfairly receiving a windfall, see, e.g., Ex. 1 at 1 (discussing Reb's concern that imprecise calculations could result in Arne receiving an unintended windfall); Ex. 6 at 2 (same), it is plausible to describe Paragraph 21's purpose as an effort to satisfy not merely Arne's desire to maintain his interest in Polpis-related profits but Reb's preference for a flexible mechanism for capturing Polpis' future value coupled with Arne's preference for receiving financing promptly rather than waiting to see how Polpis' value evolved.

[15] As Reb points out, D. 69 at 11, courts have recognized that where parties have freely and voluntarily contracted to accept a non-judicial decision as final, "absent a statutory command to the contrary, courts are precluded from reviewing the merits of a decision by one to whom the parties have entrusted the resolution of a dispute." Baker Industries, Inc. v. Cerberus, Ltd., 570 F. Supp. 1237, 1251 (D.N.J. 1983); see also id. (collecting cases); Maine Central Railroad Co. v. Bhd. of Maint. of Way Emps., 873 F.2d 425, 428 (1st Cir. 1989) (noting that "[j]udicial review of an arbitration award is among the narrowest known in the law"); City of Lynn v. Thompson, 435 Mass. 54, 61 (2001) (same).

**D. The "If, As and When" Language Unambiguously Creates a Condition Precedent and Does Not Create an Implied Obligation on Reb to Sell Polpis**

91.    The Court has previously acknowledged the strength of Reb's position that the phrase "if, as and when" unambiguously created a condition precedent, noting that "Massachusetts courts have reached this conclusion regarding identical 'if, as and when' language or similar phrases in other contracts," Jensen I, 2011 WL 2174898 at *7 (collecting cases), and that " the meaning of Paragraph 21's 'if, as or when' language appears at first blush to be plain — i.e., that Reb and Bonnie 'may,' but are not required, to sell the Polpis property — and Arne may have an uphill battle convincing the Court otherwise."  Id.

92.    The Court notes the statement in Chaplin's February 9, 1989 letter to Puzo that "we are probably talking about a matter of timing, not whether there should be a sale [of Polpis] at some point prior to 2010," Ex. 1 at 2, and, in light of that statement, sees no reason to discredit Arne's testimony that he would not have signed the June 22, 1990 Agreement if he thought it would allow Reb to not sell Polpis (and thus avoid triggering Reb's windfall obligations).  Tr. 1:197-98.  But it is clear to the Court that Arne's belief cannot be squared with the plain text of the June 22, 1990 Agreement, or with the parties' conduct both leading up to the agreement's formation and their performance after June 22, 1990.

93.    First, elsewhere in Chaplin's February 9, 1989 letter, he states that "Reb would be willing to couple . . . a buyout with a provision that if the development rights to Polpis were ultimately sold for a figure (net of all expenses), one-third of which exceeded Arne's buyout plus Reb's borrowing costs, then Arne would receive the difference." Ex. 1 at 2. While the phrase "the development rights to Polpis" does not explicitly specify that it refers to the rights to all of Polpis, it is clear from Puzo's March 3, 1989 reply letter that Puzo understood Chaplin's letter to mean

precisely that.  Ex. 2 at 2 (summarizing Chaplin's letter as providing "Reb's assurance that if, as and when the development rights for <u>all</u> of Polpis are sold to a third party, there would be protection on the upside for Arne") (emphasis added).

94.  Although there was a great deal more negotiation about Arne's upside protection, no reference was made to the issue of when such protection would commence – as soon as any of Polpis was sold, or, at the other extreme, not until all of Polpis was sold – for over a year, when the parties neared agreement on a $625,000 buyout figure and Chaplin circulated a draft provision on March 26, 1990 that provided the template for Paragraph 21:  "Should Reb hereafter participate in a sale of the development rights in <u>portions</u> of Polpis aside from his own house lot and one for Bonnie, he recognizes an obligation" to provide Arne with a share of profits to avoid a windfall.  Ex. 9 at 2 (emphasis added).  Neither Reb nor Chaplin was able to testify as to why the phrase "portions of Polpis" was included in this proposal in lieu of the phrase "all of Polpis" or why the phrase "if, as and when" was removed and replaced with "[s]hould."  As discussed above, on April 19, 1990, Arne signed Chaplin's draft proposal, stating that he agreed to it in principle.  Ex. 9 at 3.

95.  The same "portions of Polpis" language was repeated (as was the term "should" lieu of "if, as and when" language) in Chaplin's April 27, 1990 letter, Ex. 10, which Arne signed with a notation stating that he approved of the letters contents on both April 27, 1990 and May 11, 1990. Ex. 10 at 3.

96.  There was a flurry of communication between Puzo, Morse and Chaplin over the next few days, but none of it discussed the issue of "all" versus "portions" of Polpis or the inclusion of the phrase "if, as and when" as opposed to "should" until Chaplin circulated a draft agreement on June 11, 1990, which removed the phrase "portions of Polpis," returned to the phrase "all of Polpis,"

and again prefaced the clause with the phrase "if, as and when" instead of "should." Ex. 37 at 8. Chaplin testified that the change from "portions of Polpis" to "all of Polpis" was designed to reflect what he thought was the clear fact that one could not calculate a windfall without knowing the eventual price that all of Polpis had sold for. Tr. 2:87.

97. On June 13, Chaplin sent a letter to Morse discussing Reb's willingness to alter his will to include reference to his moral obligation regarding any windfall. Ex. 13. In that letter, Chaplin stated that "it is Reb's clear intention that the moral obligation be carried out by his legal representatives should he die before there has been an <u>ultimate disposition</u> of Polpis." <u>Id.</u> at 2 (emphasis added).

98. The "all of Polpis" and "if, as and when" language from the June 11, 1990 proposal circulated by Chaplin was retained in the June 22, 1990 Agreement. Ex. 15 at 13.

99. There is nothing in the record leading up to and including the June 22, 1990 Agreement that would compel the Court to conclude that at the time of contract formation Arne and Reb shared an intent that was inconsistent with a plain text reading of the "if, as and when" language in Paragraph 21 as creating a condition precedent predicated on Reb's selling "all of Polpis" (exclusive of house lots).

100. Additionally, in the years since the June 22, 1990 Agreement, Reb, acting in his capacity as the Trust trustee, has sold or otherwise conveyed a number of Polpis properties without notifying Arne or performing any windfall calculation to determine whether Reb is obligated at this point to share any windfall profits with Arne. Exs. 18-23; Tr. 1:105. On June 28, 2001, after Reb had sold at least two of the aforementioned Polpis properties, Chaplin sent a letter to Morse stating that "any determination as to the existence or non-existence of a windfall can only be made after a

disposition of Reb's interest has actually occurred." Ex. 43. Arne did not file suit challenging this interpretation until roughly nine years later. D. 2-1. Again, while post-agreement conduct carries less weight in the Court's analysis than the negotiations leading to contract formation, <u>Lanier Prof'l Servs., Inc.</u>, 192 F.3d at 4, Arne and Reb's conduct since the June 22, 1990 Agreement provides no support to Arne's position that the parties' intent at the time of contract formation was inconsistent with a plain text reading of the June 22, 1990 Agreement treating the "if, as and when" language in Paragraph 21 as creating a condition precedent predicated on Reb's selling all of Polpis (exclusive of house lots).

101. For all these reasons, Arne's argument that the plain text of the June 22, 1990 Agreement cannot be squared with Arne and Reb's shared intent and thus cannot be construed as a condition precedent, <u>see</u> Arne's Post-Trial Memo, D. 71 at 11 (citing <u>Malden Knitting Mills v. U.S. Rubber Co.</u>, 301 Mass. 229, 233 (1938) ("even when words are used, which might be construed to be a condition in their ordinary sense, they shall not be so considered, if such construction is not consistent with the intent of the parties") (citation omitted)), is unavailing in light of the evidence presented to the Court. Accordingly, the Court concludes that the "if, as and when" language in Paragraph 21 creates a condition precedent based on the sale of all of Polpis (exclusive of house lots).

102. Further, the Court finds no support in the record or in the text of the June 22, 1990 Agreement for Arne's assertion that the agreement imposes an implied obligation on Reb to sell Polpis, Arne's Post-Trial Memo, D. 71 at 15-17, nor any evidentiary basis for granting Arne's request that the Court order a sale of Polpis. <u>Id.</u> at 17.

103.  Arne points to two cases, <u>Cavanagh v. Cavanagh</u>, 33 Mass. App. Ct. 240, 243 (1992) and <u>C.J. Hogan, Inc. v. Atlantic Corp.</u>, 332 Mass. 322, 328 (1955) in support of his argument that "where, as here, a contractual provision specifies that payment is due upon the occurrence of a contingency that is within the obligor's control, the general rule is that payment is to be made in a reasonable time."  D. 71 at 17 n.8.  Neither case is of assistance to Arne's claim here.

104.  In <u>Cavanagh</u>, a divorce agreement between Lindsay and Paul Cavanagh provided that "Lindsay will convey all of her right, title and interest in the marital home to Paul . . . for the agreed sum of $397,500.00," and that Paul was to make three successive payments of $100,000 to Lindsay over the ensuing year with and the balance of $97,500 "to be paid upon the sale of the marital home by Paul." <u>Cavanagh</u>, 33 Mass. App. Ct. at 241.  Paul subsequently informed his wife that he had no intention of selling the marital home "now or ever," <u>id.</u>, and after making the three initial payments of $100,000 refused to make the final payment of $97,500.  <u>Id.</u>  In proceedings before the appellate court, Paul argued that "selling the marital home operated as a condition precedent to Paul's duty to make the final payment," and Lindsay argued that "that Paul's duty to pay the $97,500 is absolute-not conditional-and that the agreement implicitly included a provision to provide a reasonable time within which Paul was obligated to perform." <u>Id.</u> at 241-42.  Lindsay prevailed; the <u>Cavanagh</u> court wrote that "[w]e reject Paul's interpretation that the payment of $97,500 was conditioned exclusively upon his sale of the marital home. . . . A construction of the agreement whereby Paul would never have to make the final payment contravenes the basic provision of [the clause in the divorce agreement stating] that 'Paul . . . <u>will</u> pay [$397,500] to Lindsay' for her interest in the marital home," <u>id.</u> at 242 (emphasis supplied by the <u>Cavanagh</u> court), and concluded that Paul was obligated to make the final payment within a reasonable time.  <u>Id.</u> at 243.

105.  Here, the June 22, 1990 Agreement's "if, as and when" language is a far cry from Cavanagh's "will pay" language.  This Court's conclusion, set forth above, that the June 22, 1990 Agreement includes a condition precedent makes this case clearly distinguishable from Cavanagh, where the court's imposition of an obligation on Paul to make a payment in a reasonable time turned entirely on the fact that the agreement at issue included not a condition precedent but an absolute duty.

106.  C.J. Hogan is distinguishable for essentially the same reason.  In C.J. Hogan, the plaintiff trucking company borrowed money from the defendant finance company via a series of loans bearing interest.  C.J. Hogan, 332 Mass. at 323-24.  When the trucker sought a subsequent loan from the finance company, a dispute ensued about how much money the trucking company owed on the previous loans and the parties resolved the dispute by agreeing that the finance company would issue a new loan and that trucking company would agree to repay the principal on the old loans in the amount of nearly $8,000 "payable on demand" and would repay the outstanding interest in the amount of $3,000 "payable at the time that C.J. Hogan, Inc., would sell its New York transportation and carriers license certificates and permits."  Id. at 324.  The C.J. Hogan court noted that this agreement was reached as a way of settling old debts the trucking company was absolutely obligated to pay to the finance company, and concluded that "it seems unlikely that the parties intended that this liability for money previously absolutely due should become wholly conditional at the option of the plaintiff upon the disposition of some of its property."  Id. at 328.  The court noted further that "[i]t is generally held that an existing obligation does not lose its absolute character and become a conditional one just because a subsequent agreement of the parties postpones payment until the happening of some specified contingency wholly, or even partly, within

the obligor's control," and ordered that the trucking company pay the $3,000 at issue in a reasonable time.  Id.

107.  Here, the "if, as and when" language at issue in the June 22, 1990 Agreement did not impose upon Reb  an "absolute obligation" or a duty of "absolute character"; instead, as discussed above, the language at issue clearly created a condition precedent.  C.J. Hogan is thus inapplicable for the same reason as Cavanagh.

108.  Accordingly, the Court concludes that the June 22, 1990 Agreement does not create an implied obligation upon Reb to sell Polpis and does not create a basis for this Court to order such a sale.

## V.  Conclusion

109.  In light of these findings of fact and conclusions of law, the Court issues a declaratory judgment as to Count III as follows:

A.  The "if, as and when" language in Paragraph 21 of the June 22, 1990 Agreement creates a condition precedent that will not occur until Reb and Bonnie should come to sell the rights to all of Polpis except their house lots;

B.  Regardless of the occurrence or non-occurrence of the condition precedent, Reb's moral obligation related to compensating Arne for any windfall resulting from the sale of Polpis is committed to Reb's discretion and not judicial determination; and

C.  The June 22, 1990 Agreement does not impose on Reb an implied obligation to sell Polpis.

110.  To the extent that Count III additionally seeks from this Court a monetary award plus interest and costs, D. 57 at ¶ 49, any such request is denied in light of the Court's rulings above.

**So ordered.**

/s/ Denise J.  Casper
United States District Judge